## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| BRAHMAN PARTNERS II, L.P., BRAHMAN PARTNERS III, L.P., BRAHMAN PARTNERS II OFFSHORE, LTD., BRAHMAN INSTITUTIONAL PARTNERS, L.P., BRAHMAN C.P.F. PARTNERS, L.P., BRAHMAN PARTNERS IV, L.P., BRAHMAN PARTNERS IV (CAYMAN), LTD., and BH INVESTMENTS FUND, L.L.C., | CIVIL ACTION NO. |
| | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND THE COMMON LAW** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| OCWEN FINANCIAL CORPORATION, WILLIAM ERBEY, and RONALD FARIS, | |
| Defendants. | |

Plaintiffs Brahman Partners II, L.P., Brahman Partners III, L.P., Brahman Partners II Offshore, Ltd., Brahman Institutional Partners, L.P., Brahman C.P.F. Partners, L.P., Brahman Partners IV, L.P., Brahman Partners IV (Cayman), Ltd., and BH Investments Fund, L.L.C., ("Plaintiffs") are investment funds that purchased the common stock of Defendant Ocwen Financial Corporation ("Ocwen" or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, bring this action against Ocwen and certain of its former and present officers and directors, Defendants William Erbey ("Erbey") and Ronald Faris ("Faris" and, collectively with Erbey, the "Individual Defendants"), and allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, a review and analysis of: Ocwen's filings with the U.S. Securities and Exchange Commission ("SEC"); a January 20, 2016 SEC order instating a settled administrative proceeding against Ocwen (the "SEC Consent Order"); an October 5, 2015 SEC order instituting a settled administrative proceeding against Ocwen's affiliate, Home Loan Servicing Solutions Ltd. (the "HLSS Consent Order"); various letters sent by the Superintendent of the New York State Department of Financial Services to Ocwen; consent orders and agreements between Ocwen, Ocwen Loan Servicing LLC, and the NYDFS; the National Mortgage Settlement ("NMS") and related public filings; several reports issued by Joseph A. Smith, Jr. concerning Ocwen's compliance with the NMS; pleadings, motion papers, exhibits to declarations filed in the matter *In re Ocwen Financial Corporation Securities Litigation*, 14-cv-81057-WPD (S.D. Fla.) (the "Class Action Proceeding"); decisions, opinions and orders issued by the Court in the Class Action Proceeding; pleadings, motion papers, exhibits to declarations filed in the matter *Broadway Gate Master Fund, Ltd., et al. v. Ocwen Financial Corp., et al.*, 16-cv-80056-WPD (S.D. Fla.) (the "Broadway Gate Proceeding"); decisions, opinions and orders issued by the Court in the Broadway Gate Proceeding; pleadings, motion papers, and exhibits to declarations filed in the matter *Consumer Financial Protection Bureau v. Ocwen Financial Corp. et al.*, 17-cv-80495-KAM (S.D. Fla.) (the "CFPB Proceeding"); and other public documents and media reports concerning Ocwen and its affiliates. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     Plaintiffs bring this action under the federal securities laws and under the common law to recover the investment losses they suffered as a result of numerous false and misleading statements that Ocwen and its executives made to induce Plaintiffs to purchase the common stock of Ocwen.   Plaintiffs suffered significant investment losses when a series of partial disclosures were made to the market and the price of Ocwen's common stock plummeted as a result.

2.     Ocwen is a mortgage servicing company based in Florida that was founded and – until recently – led by Defendant Erbey.  Erbey has since been forced to resign his position. Defendant Erbey's right-hand man in running Ocwen was his long time compatriot, Defendant Faris.

3.     Plaintiffs are investment funds managed by a common adviser based in New York.

4.     In 2013, Defendants sought to induce Plaintiffs to invest in Ocwen.  Rather than providing accurate information about the company, however, Defendants made numerous misrepresentations to Plaintiffs' investment adviser to induce Plaintiffs to purchase Ocwen stock.

5.     Over the course of 2013, Defendants induced Plaintiffs to purchase hundreds of millions of dollars of Ocwen stock by making false and materially misleading statements concerning related-party transactions, regulatory compliance, and disclosure controls.

6.     As this Court has found *as a matter of law* in another investor suit, Defendants made false and misleading statements concerning the purported policies Ocwen had adopted to prevent conflicts of interest, and about Erbey's recusal from the approval of related-party transactions.  Between 2009 and 2012, Erbey spun off four of Ocwen's businesses into separate public companies that served as customers of and service providers to Ocwen.  Erbey was

Chairman of Ocwen and all of these related companies, and a large shareholder of Ocwen and most of the related companies.  Defendants repeatedly represented that Ocwen had adopted policies, procedures, and practices to avoid potential conflicts of interest arising from Erbey's positions with each of these companies, including Erbey recusing himself from the negotiation and approval of transactions between Ocwen and the related companies.

7.      However, Ocwen had no such policies, and Erbey regularly approved transactions between Ocwen and the related companies.

8.      Thus, in resolving a motion for summary judgment in the Class Action Proceeding several years later, this Court held that Defendants' statements concerning Ocwen's adoption of policies to avoid potential conflicts of interest, and their statements about Erbey's recusal from the negotiation and approval of transactions between Ocwen and the related companies, were materially false and misleading as a matter of law.  The Court determined that Ocwen did not have a specific policy requiring that Erbey recuse himself from related-party transactions, and that Erbey did not, in fact, recuse himself from all related-party transactions.

9.      In December 2014, Ocwen entered into a consent order with the New York State Department of Financial Services (the "NYDFS 2014 Consent Order") pursuant to which it admitted Erbey's improper involvement in related-party transactions.  As a result of these conflicts and misconduct, Erbey agreed to resign from his position with Ocwen and all of the related companies.

10.      Defendants also made false statements about Ocwen's regulatory compliance.  As a mortgage servicer, Ocwen is heavily regulated because its actions can result in people losing their most important asset:  their home.  Thus, Ocwen was required to service mortgage loans in compliance with a number of overlapping servicing standards set forth in a 2011 agreement with

the New York State Department of Financial Services ("NYDFS 2011 Agreement") and in the National Mortgage Settlement ("NMS").  Under these servicing standards, Ocwen agreed to end Robo-signing, improve staffing levels and training requirements, provide a dedicated single point of contact for borrowers, ensure that any force-placed insurance was reasonably priced and obtained in an arm's-length transaction, not charge improper fees to borrowers, and undertake certain best practices in pursuing foreclosures. Ocwen's failure to comply with these requirements could subject it to penalties, loss of license, or restrictions on its ability to purchase new mortgage servicing rights.  On October 31, 2013, Defendant Faris publicly represented Ocwen's "strong compliance" with regulatory requirements.

11.     However, Ocwen was not complying with regulatory requirements – in a number of ways.  According to the NYDFS 2014 Consent Order – to which Ocwen expressly agreed, including the facts stated therein – Ocwen had been backdating letters to borrowers "for years." That is, Ocwen had been sending letters to borrowers containing deadlines that predated the mailing of the letters, potentially resulting in the improper denial by Ocwen of modification requests and other relief to which homeowners were entitled.   Other significant regulatory violations identified in the NYDFS 2014 Consent Order included:

- Ocwen failed to confirm that it had the right to foreclose before initiating foreclosure proceedings;

- Ocwen failed to ensure that its statements to the court in foreclosure proceedings were correct;

- Ocwen pursued foreclosure even while modification applications were pending; and

- Ocwen failed to maintain records confirming that it is not pursuing foreclosure of members of the military serving active duty.

12.     At the heart of Ocwen's regulatory compliance issues was its proprietary servicing platform, REALServicing, which was created by one of Ocwen's related companies, Altisource Solutions.  According to one of Ocwen's federal regulators, the Consumer Financial Protection Bureau ("CFPB"), Ocwen's servicing platform was compromised and unreliable: "REALServicing suffers from fundamental system architecture and design flaws, including a lack of properly managed data, lack of automation, and lack of capacity."  In an email quoted in the CFPB's federal complaint against Ocwen, Ocwen's Head of Servicing described REALServicing as "***an absolute train wreck***"[1] that caused him to want to "change systems tomorrow" if he could.  Indeed, today Ocwen no longer uses REALServicing and has instead switched to a servicing platform run by a non-Ocwen-related entity.

13.     According to documents in the Class Action Proceeding and the Broadway Gate Proceeding publicly filed after the close of discovery in those cases, Ocwen did not have a compliance management system in place in 2013.  The CFPB requires a regulated entity, such as Ocwen, to "develop and maintain a sound compliance management system" in order to assure compliance with regulatory requirements.  The absence of a compliance management system at Ocwen is another reason why Faris's October 31, 2013 representation of Ocwen's "strong compliance" was materially false and misleading.

14.     Finally, Defendants falsely certified that Ocwen had effective disclosure controls and procedures so that any material information would be promptly discovered and publicly disclosed.  In each of its periodic filings with the SEC during the relevant time period, Ocwen's CEO and CFO personally certified that Ocwen had designed and implemented effective disclosure controls and procedures.  However, these certifications were materially false and

---

[1] Unless otherwise noted, emphasis in quotations has been added to the original.

misleading in light of the fact that Ocwen failed to disclose to investors that: (a) it had not adopted a specific policy requiring Erbey's recusal from related-party transactions; (b) Erbey actually approved related-party transactions; (c) Ocwen had been backdating letters to borrowers for years; (d) Ocwen's mortgage servicing platform was a "train wreck"; and (e) Ocwen did not have a compliance management system in place.

15.     Plaintiffs purchased their Ocwen common stock between May 2013 and early February 2014 in reliance on Defendants' misrepresentations. In making the decisions to invest in Ocwen common stock, Plaintiffs' investment adviser read, reviewed, listened to, and relied on Defendants' materially misleading statements. Plaintiffs' investment adviser also relied on the integrity of the market price of Ocwen's common stock. Plaintiffs and their investment adviser were unaware of the falsity of Defendants' statements when Plaintiffs purchased Ocwen stock.

16.     Defendants' misrepresentations caused Plaintiffs to purchase Ocwen common stock at artificially-inflated prices. Had it not been for these repeated material misrepresentations, Plaintiffs either would not have purchased their Ocwen shares or would not have paid the prices they paid.

17.     When information about Ocwen's related-party conflicts, regulatory noncompliance and lack of disclosure controls was partially publicly disclosed and processed by the market in February 2014, Plaintiffs suffered significant investment losses.

18.     Plaintiffs therefore bring this action to recover the damages suffered as a result of the wrongs committed by Defendants.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

20. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

22. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## **PARTIES**

### **A.   Plaintiffs**

23. Plaintiff Brahman Partners II, L.P. is a Delaware limited partnership whose investment adviser has its main office location in New York, New York. A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit A.

24. Plaintiff Brahman Partners III, L.P. is a Delaware limited partnership whose investment adviser has its main office location in New York, New York. A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit B.

25. Plaintiff Brahman Partners II Offshore, Ltd. is a Cayman Islands company whose investment adviser has its main office location in New York, New York. A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit C.

26.     Plaintiff Brahman Institutional Partners, L.P. was at all relevant times a Delaware limited partnership whose investment adviser had its main office location in New York, New York.  A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit D.

27.     Plaintiff Brahman C.P.F. Partners, L.P. was at all relevant times a Delaware limited partnership whose investment adviser had its main office location in New York, New York.  A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit E.

28.     Plaintiff Brahman Partners IV, L.P. is a Delaware limited partnership whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit F.

29.     Plaintiff Brahman Partners IV (Cayman), Ltd. is a Cayman Islands company whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit G.

30.     Plaintiff BH Investments Fund, L.L.C. is a Delaware limited liability company whose investment adviser has its main office location in New York, New York.  A list of the dates on which it purchased Ocwen common stock during the relevant period is attached hereto as Exhibit H.

31.     At all relevant times, Brahman Capital Corp. ("Brahman") acted as investment adviser to Plaintiffs in connection with their purchases of Ocwen common stock.

     **B.**     <u>**Defendants**</u>

32.     Defendant Ocwen is a Florida corporation with its principal place of business at 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409.  At all relevant times, Ocwen was a publicly-traded company.

33.     Defendant Erbey is the founder and former Chairman of Ocwen.  Upon information and belief, Erbey resides in Saint Croix, U.S. Virgin Islands.

34.     Defendant Faris is the Chief Executive Officer of Ocwen.  Upon information and belief, Faris resides at 11970 Torreyanna Circle, West Palm Beach, FL 33412.

<u>**FACTUAL ALLEGATIONS**</u>

**I.**     <u>**Events Prior to Plaintiffs' Investment in Ocwen**</u>

     **A.**     <u>**The Mortgage Servicing Industry**</u>

35.     Ocwen's primary line of business is residential mortgage loan servicing.  Ocwen is one of the largest mortgage servicers in the United States.  Unlike traditional mortgage loan servicers, Ocwen is not a bank regulated by the Federal Deposit Insurance Corporation or the Office of the Comptroller of the Currency, but rather a financial services company.

36.     Mortgage loan servicers play an important role in the mortgage industry.  The servicers are the entities responsible for (i) collecting and remitting the monthly payments of principal and interest made by the homeowner to repay the mortgage loan, (ii) administering the escrow accounts from which the borrower's property taxes and homeowners insurance are paid, and (iii) managing loans when the borrower has become delinquent in making payments (including negotiating loan modifications with the borrower or instituting foreclosure proceedings against the mortgaged property).  It is the servicer, and not the lender, that the homeowner communicates with about their mortgage loan.

37.     Thus, as a mortgage servicer, Ocwen is required to process and apply homeowner mortgage payments, communicate with homeowners about their loan, insurance and property tax payments, and create accurate files for each homeowner.  Ocwen is the counterparty who decides whether a struggling homeowner's loan terms can be modified, or whether a delinquent borrower's home should be foreclosed upon.

38.     A servicer's electronic servicing platform is critical to the proper execution of these functions, as well as to the servicer's ability to service loans in accordance with regulatory requirements.  Servicers input loan and borrower information into these electronic servicing platforms.  If the information is inputted incorrectly, or the servicing platform has deficiencies that produce inaccurate information, servicers can make critical errors that lead to harsh results, including the loss of a home.

39.     Servicers are also the parties responsible for obtaining homeowners insurance when a homeowner has let his insurance coverage lapse.  The insurance procured by the servicer in such circumstances is called "force placed" insurance.

40.     In today's capital markets, mortgage loans are frequently pooled together into securitized trusts in which interests, or "residential mortgage backed securities," are sold to investors.  Companies that service loans owned by such securitized trusts are obligated to make servicing advances to the trusts; that is, the servicer is required to pay the trust for missed payments that the servicer expects the borrower will ultimately pay.  Although servicers are entitled to be reimbursed for any servicing advances they make, the existence of such a requirement requires the servicer to maintain a financing facility.

41.     A servicer's primary form of remuneration is its mortgage servicing fee, which is a percentage of the unpaid principal balance, or "UPB," of the mortgage loans being serviced.

Servicers may also earn ancillary fees such as retaining the interest that accrues on loan payments between the time they are paid by the borrower and remitted to the lender or the trust, and in some circumstances collecting late fees from homeowners during a period of delinquency.

42.     The party that owns the right to service a mortgage loan is said to hold the mortgage servicing rights, or "MSRs."  Sometimes, the holder of MSRs will hire a subservicer or a special servicer to service a particular mortgage loan.

**B.     Erbey, Ocwen and the Related Companies**

43.     Ocwen was founded in 1988 by Erbey and his business partner, Barry Wish, following the dissolution of Wish and Erbey's existing venture, The Oxford Financial Group.

44.     During its early years, Wish and Erbey focused Ocwen's growth on the acquisition of nonperforming loans.

45.     Initially, Wish was Ocwen's Chairman and Erbey was its CEO.  However, Erbey replaced Wish as Chairman in 1996.  Erbey served as Ocwen's Chairman and CEO until 2010, when he appointed Faris as CEO.  Faris had served Erbey in various roles at Ocwen since 1991, working his way up the corporate ladder to become Erbey's right-hand man.  Erbey remained as Chairman of Ocwen after he appointed Faris CEO.

46.     In 1999, frustrated with the increasing regulatory scrutiny that Ocwen was receiving from the Office of Thrift Supervision, Erbey commenced a "de-banking" process for Ocwen, turning Ocwen from a thrift bank into a financial services company.  The de-banking process was completed in 2004.

47.     Part of Erbey's subsequent plan for Ocwen was to "spin off" certain of Ocwen's business segments into related, but purportedly independent, public companies.  Erbey became Chairman of all of these new companies, while continuing in his position as Chairman of Ocwen. He also received large equity positions in most of the new companies.

48.     In 2009, Erbey spun off Ocwen Solutions into a company called Altisource Portfolio Solutions S.A. ("Altisource Solutions").  Ocwen Solutions had performed a number of services for Ocwen, one of which was developing the technology that Ocwen used to service mortgage loans.  Following the spin-off, Ocwen entered into a long-term licensing agreement to use Altisource Solutions' electronic servicing platform (or "system of record"), REALServicing. Ocwen is Altisource Solution's largest customer.

49.     Altisource Solutions created an insurance agency subsidiary called Beltline Road Insurance Agency ("Beltline").   In August 2013, Ocwen appointed Beltline as its exclusive insurance representative.

50.     In 2011, Erbey created a new business entity called Home Loan Servicing Solutions, Ltd. ("HLSS").  The purpose of HLSS was to allow Ocwen to pursue an "asset-lite" strategy.  Ocwen sold many of its MSRs to HLSS, meaning that HLSS received the servicing fees and made the servicing advances on those loans, while Ocwen retained the right to subservice those loans and keep the ancillary fees.  Erbey became Chairman of HLSS and received stock in HLSS.

51.     In 2012, Erbey spun off two more public companies:  Altisource Residential Corporation ("Altisource Residential") and Altisource Asset Management Corporation ("Altisource Asset Management").  The purpose of Altisource Residential is to acquire non-performing loans from Ocwen, and then convert foreclosed properties into rental units.  The income from those rental properties are passed through to Altisource Residential's investors. Erbey became Chairman of Altisource Residential and received a substantial ownership percentage of Altisource Residential.

52.     Altisource Asset Management is the asset manager for Altisource Residential under a fifteen-year asset management agreement between the two entities.  As of December 31, 2013, Altisource Asset Management had only seven employees, and shared the same executive officers as Altisource Residential.  Erbey became Chairman of Altisource Asset Management and received a substantial beneficial ownership percentage of Altisource Asset Management.

53.     Throughout this Complaint, Altisource Solutions, HLSS, Altisource Residential, and Altisource Asset Management will be referred to collectively as the "Related Companies."

### C.     Ocwen's Growth

54.      As is well known, the collapse of the U.S. housing market and the resulting subprime mortgage crisis in 2007 led to a global financial crisis in 2008.

55.     During the global financial crisis, Ocwen took advantage of the resulting increase in mortgage loan delinquencies.  Among other things, Ocwen's reduced labor costs, which it achieved by outsourcing customer service positions to India, allowed it to acquire and service large volumes of subprime loans.

56.     In response to the global financial crisis, governments around the globe passed sweeping reforms concerning the regulation and supervision of banks.  For example, in July 2010, Congress enacted the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank").

57.     This heightened regulatory environment allowed Ocwen to further benefit from the financial crisis because it was no longer a bank.  As a result of the reforms and increased compliance framework, several large banks exited the mortgage servicing business and sold their MSRs to non-banks.

58.     Ocwen purchased many of the divesting banks' servicing businesses and MSRs. For example, in 2011, Ocwen acquired Goldman Sach's mortgage servicing arm, Litton Loan

Servicing.  Similarly, in 2012 Morgan Stanley exited the mortgage servicing industry by selling its servicing unit, Saxon, to Ocwen.

59.     Ocwen's largest acquisition during this time period was its 2013 purchase of 1,740,000 loans, with a UPB of $183.1 billion, from Residential Capital, LLC ("ResCap").

60.     From 2010 through 2013, Ocwen grew rapidly via portfolio and business acquisitions.  In 2010, Ocwen serviced approximately $74 billion UPB of mortgage loans.  By 2013, that number had risen to approximately $500 billion.

**D.     Regulatory Servicing Standards**

61.     Despite its non-bank status, Ocwen was not free from the increased regulatory oversight imposed in the wake of the financial crisis.

62.     In 2011, the NYDFS – due to its concern with Ocwen's rapid growth – required Ocwen to enter into an agreement governing Ocwen's servicing practices.  The NYDFS 2011 Agreement contained 62 paragraphs of mortgage servicing practices to which Ocwen agreed to adhere.  Among other things, Ocwen agreed to end Robo-signing, improve staffing levels and training requirements, provide a dedicated single point of contact for borrowers, ensure that any force-placed insurance is reasonably priced and obtained in an arm's-length transaction, not charge improper fees to borrowers, and undertake certain best practices in pursuing foreclosures.

63.     In 2012, the NYDFS discovered that Ocwen had violated that agreement, and therefore required Ocwen to retain a compliance monitor to conduct a comprehensive review of Ocwen's servicing operations over a two-year period (the "NYDFS Compliance Monitor").  The NYDFS Compliance Monitor was required to submit an initial "Compliance Review Report," followed by periodic "Progress Reports," and an "Action Plan" for Ocwen to remediate its noncompliance with the NYDFS Agreement.

64.     In February 2012, the CFPB (a new federal agency created under Dodd-Frank), forty-nine states, and the District of Columbia announced a global settlement of federal and state investigations against the country's five-largest mortgage servicers (at that time, Bank of America Corporation, JP Morgan Chase & Co., Wells Fargo & Company, Citigroup Inc. and Ally Financial Inc.) for improper mortgage practices (the "National Mortgage Settlement" or "NMS").  ResCap is a subsidiary of Ally Financial, and thus became subject to the NMS too.

65.     Among other things, the National Mortgage Settlement included servicing standards with which servicers were required to comply, many of which overlapped with the servicing standards in the NYDFS 2011 Agreement.  The NMS servicing standards required servicers to:  (a) fix common flaws in foreclosure and bankruptcy procedures (including ensuring that the servicer has the right to foreclose before instituting foreclosure proceedings, and verifying that factual assertions made in court documents are accurate); (b) adopt policies and processes to oversee and manage third-party providers retained by the servicer; (c) adopt loss mitigation procedures to reduce foreclosures (including a prohibition on instituting foreclosure proceedings against a borrower with a pending loan modification application); (d) establish a single point of contact for each borrower; (e) implement standard loan modification timelines (including providing the borrower with thirty days to appeal the denial of a loan modification request); (f) implement special procedures to protect active military personnel from foreclosure; (g) not charge unreasonable fees to the borrower; and (h) not unnecessarily impose force-placed insurance on a borrower.

66.     Moreover, servicers subject to the National Mortgage Settlement are required to set up an "Internal Review Group," establish adequate staffing levels and improve training of mortgage professionals.

67.     Although Ocwen initially was not a party to the National Mortgage Settlement, when it acquired the ResCap loans, it was required to service those loans in accordance with the NMS servicing standards.

68.     In December 2013, Ocwen reached a separate agreement with several governmental authorities to comply with the National Mortgage Settlement.  This agreement required Ocwen to service all loans, not just the ResCap loans, in accordance with the NMS.

II.     **Defendants' Representations to Induce Plaintiffs to Invest in Ocwen**

69.     To induce Plaintiffs to purchase Ocwen's common stock, Defendants made numerous representations about Ocwen's business.  These representations included assurances about the safeguards Ocwen had implemented to protect against potential conflicts of interest, Ocwen's compliance with regulatory standards, and the implementation of effective disclosure controls and procedures.

     A.     **Representations Concerning Ocwen's Policies to Avoid Potential Conflicts of Interest and Erbey's Recusal from Transactions with the Related Companies**

70.     Erbey's control over both Ocwen and the Related Companies created concerns for Plaintiffs and the investment community about the existence of potential conflicts of interests in transactions between Ocwen and one of more of the Related Companies.  Specifically, Plaintiffs and other investors were concerned about the possibility that, based on his leadership position at the Related Companies, Erbey could cause Ocwen to enter into business deals with the Related Companies that were less favorable than Ocwen would otherwise achieve in an arm's-length transaction with nonaffiliated third parties.

71.     Plaintiffs therefore sought assurances that Erbey would not be dictating or influencing the terms of the business deals between Ocwen, on the one hand, and the Related Companies, on the other.

72.     In response to such concerns, Defendants repeatedly represented that Ocwen had sufficient safeguards in place to prevent Erbey's interference in such deals.

73.     In Ocwen's annual report for 2012, issued on or about March 1, 2013, Ocwen, Erbey, and Faris represented:  "We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related parties such as Altisource [Solutions], including Mr. Erbey's recusal from negotiations . . . and board approvals of such transactions."

74.     Ocwen made similar statements in its proxy statement for its annual meeting of shareholders issued on April 3, 2013.  Specifically, Ocwen stated that:  "Due to the nature of Mr. Erbey's obligations to each of [Ocwen, HLSS, Altisource Solutions, Altisource Residential and Altisource Asset Management], he recuses himself from decisions pertaining to any related transactions."

75.     Erbey made such representations himself during telephone conference calls with investors.  On a December 3, 2013 conference call, Erbey told investors:  "I'd like to stress, first of all, that [the Related Companies] are not affiliates, that they are independent companies.  They have independent boards, and they have management teams."  A few minutes later, Erbey stated emphatically:  "[W]e have [a] robust related party transaction approval process.  Any related party transaction between the [Related Companies and Ocwen], I actually recuse myself from . . . ."

### B.     Representations Concerning Regulatory Compliance

76.     Ocwen's compliance with the NYDFS 2011 Agreement and the National Mortgage Settlement was important to Plaintiffs.  Ocwen's failure to comply with regulatory requirements – and, in particular, the servicing standards imposed by the NYDFS 2011

Agreement and the NMS – could result in the imposition of substantial penalties that would adversely affect Ocwen's business operations and results.

77.     Ocwen's compliance with regulatory requirements was particularly important with respect to the transfer of the ResCap loans – the Company's largest mortgage loan acquisition ever – onto the REALServicing electronic servicing platform.

78.     On October 31, 2013, Ocwen, Faris and Erbey held an investor call to discuss the financial results for the third quarter of 2013.  During that call, Faris discussed the transfer of ResCap loans onto the REALServicing platform.  Faris informed investors that the integration costs of the ResCap platform had been higher than expected because Ocwen had been "careful to assure excellent customer service and ***strong compliance*** throughout the transfer process."   The import of that statement was clear:  Ocwen was going to extra lengths to ensure that it was complying with the applicable servicing standards as it transferred the ResCap loans onto the REALServicing platform.

C.     **Representations Concerning Effectiveness of Disclosure Controls and Procedures**

79.     Ocwen was required to implement safeguards so that any material developments at the Company would be disclosed to investors.

80.     Accordingly, Ocwen reported that it had effective disclosure procedures and controls to ensure that material information was publicly disclosed.  For example, in its annual report for 2012, Ocwen stated that:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), as of the end of the period covered by this Annual Report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the

end of such period, our disclosure controls and procedures are effective.

81.     Under the Sarbanes-Oxley Act of 2002, Ocwen's CEO and CFO were required to personally certify as to the effectiveness of Ocwen's internal controls relating to disclosure. Thus, for example, Faris signed a certification in connection with Ocwen's 2012 10-K in which he stated that the CFO and he had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [Ocwen], including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared" and that the CFO and he had "[e]valuated the effectiveness of [Ocwen's] disclosure controls and procedures and presented in [the accompanying report] our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

82.     Faris provided identical certifications with Ocwen's quarterly reports for the first, second and third quarters of 2013.

### III.     Plaintiffs Purchase Ocwen Common Stock in Reliance on Defendants' Representations

83.     Plaintiffs are investment funds managed by Brahman.

84.     Plaintiffs, through Brahman, specifically relied on the representations set forth above prior to purchasing Ocwen stock, as well as on the integrity of the market price of Ocwen common stock.

85.     Brahman began building a "long position" – that is, buying stock based on a belief that the stock's price would increase over time – for Plaintiffs in Ocwen in May 2013.

86.     Prior to purchasing Ocwen stock for Plaintiffs, Brahman reviewed Ocwen's public disclosures, investor presentations and financial statements, and had discussions with Ocwen management.

87.     As Plaintiffs continued to purchase Ocwen stock throughout 2013 and in January and early February of 2014, Brahman kept abreast of publicly-disclosed developments concerning Ocwen by, among other things, reviewing Ocwen's SEC filings.   Brahman also continued to have direct communications with Ocwen management.

88.     Ocwen viewed Brahman as a significant institutional investor whose purchase of Ocwen stock was necessary to the company's success and to drive the stock price higher. Defendants Erbey and Faris had a significant economic interest in inducing Brahman to purchase Ocwen stock.

89.     When purchasing Ocwen stock on behalf of Plaintiffs, Brahman actually read (or heard) and relied on each of the statements described above.

90.     Each of the representations made by Defendants was material to Plaintiffs.

91.     The statements concerning Ocwen's adoption of policies to avoid potential conflicts of interest and Erbey's recusal from transactions with the Related Companies were material to Plaintiffs because Erbey's position as Chairman of the Related Companies created the potential that Erbey would act against Ocwen's interests in transactions between Ocwen and the Related Companies.

92.     The statement concerning Ocwen's strong compliance with regulatory requirements was material to Plaintiffs because Ocwen's failure to comply with those standards could result in the imposition of significant penalties against Ocwen.

93.     The statements concerning the effectiveness of Ocwen's disclosure controls and procedures were material to Plaintiffs because such disclosure controls and procedures would ensure that conflicts of interest and regulatory violations would be publicly disclosed by Ocwen.

94.     Had Brahman known the truth (as described below), it would not have purchased Ocwen common stock on behalf of Plaintiffs or, if it had done so, would not have paid the price it did.

## IV.     Defendants' Representations to Plaintiffs Were Materially False and Misleading

95.     Unbeknownst to Brahman and Plaintiffs at the time, the material representations that Defendants made concerning Ocwen's adoption of policies to avoid potential conflicts of interest and Erbey's recusal from related-party transactions, Ocwen's strong compliance with regulatory requirements, and the existence of effective disclosure controls and procedures at Ocwen were either false or omitted truthful information that rendered the representations materially misleading.

### A.     Ocwen Did Not Have a Recusal Policy and Erbey Failed to Recuse Himself from Approving Transactions with the Related Companies

96.     Contrary to Defendants' representations set forth above, Ocwen did not have effective policies in place to prevent potential conflicts of interest, and Erbey did not recuse himself from the approval of related-party transactions.

97.     On December 19, 2014, Ocwen entered into the 2014 NYDFS Consent Order. Ocwen agreed to the factual recitation set forth in that order.

98.     The 2014 NYDFS Consent Order disclosed that Ocwen had widespread conflicts of interest with related parties.  Specifically, contrary to its representations in its 2012 annual report, Ocwen agreed in the NYDFS Consent Order that it did "not have a written policy that

explicitly require[d] potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with [the Related Companies]."

99.     Moreover, Erbey did not recuse himself "from approvals of several transactions" with the Related Companies.

100.    Details of some of the transactions from which Erbey failed to recuse himself were fleshed out in an October 2015 Consent Order between HLSS and the SEC (the "HLSS Consent Order").  The HLSS Consent Order describes how Erbey, in fact, "approved many transactions between HLSS and Ocwen in both his HLSS- and Ocwen-related capacities."

101.    As noted above, HLSS was founded to make Ocwen "asset-lite" by transferring certain Ocwen-owned MSRs to HLSS and requiring HLSS to make the servicing advances on those MSRs.

102.    Between 2012 and 2013, HLSS and Ocwen entered into nine transactions in which Ocwen transferred MSRs to HLSS.

103.    For each of those transactions, Ocwen and HLSS had to negotiate the servicing fee that HLSS would collect for each MSR.

104.    The transactions had to be approved by Ocwen's Credit Committee or Executive Committee, and by HLSS's Credit Committee.  Erbey was a member of all three of these committees.  Faris also sat on Ocwen's Executive Committee.

105.    In 2012, Ocwen entered into five of these transactions with HLSS, which totaled approximately $67.5 billion in UPB.  In 2013, Ocwen entered into another four transactions with HLSS, totaling approximately $120 billion in UPB.

106.    Erbey personally approved at least six of these nine transactions between Ocwen and HLSS, both in his capacity as Chairman of Ocwen and Chairman of HLSS.

107.    Furthermore, in 2014, Erbey failed to recuse himself from a transaction between Ocwen and HLSS concerning HLSS's purchase of $672 million of loans previously purchased by Ocwen.  According to the HLSS Consent Order, "[i]n a February 2014 email addressed to members of both HLSS and Ocwen senior management, [Erbey] approved this purchase on the condition that it did not trigger losses for HLSS."

108.    Thus, rather than recusing himself from the approval of a related-party transaction – as he represented to Plaintiffs that he always did – Erbey inserted himself into the transaction and added terms that favored HLSS over Ocwen.

109.    This illustrates the conflict of interest that Erbey had as both Chairman of Ocwen and Chairman of the Related Companies, as Erbey favored the interest of HLSS at the expense of Ocwen.

110.    The SEC Consent Order provides even more examples of Erbey's failure to recuse himself from related-party transactions and the absence of any policy at Ocwen to guard against potential conflicts of interest.

111.    In addition to the HLSS conflicts identified in the HLSS Consent Order, the SEC Consent Order identified at least one additional, material related-party transaction from which Erbey failed to recuse himself.  Specifically, Erbey voted, as a member of the Ocwen Board of Directors, to approve a *$75 million* bridge loan from Altisource Solutions to Ocwen.  According to the SEC Consent Order:

> In December 2012, Ocwen entered into an agreement to borrow $75 million from Altisource as an unsecured bridge loan to serve as part of the consideration paid by Ocwen in connection with Ocwen's acquisition of another mortgage servicer.  [Erbey] voted to approve Ocwen's entry into the loan agreement.  In his role as Chairman of Altisource, [Erbey] recused himself from the decision to approve the loan.  However, *he reviewed and approved the*

*Altisource board presentation before it was circulated to the Altisource Board of Directors for the vote*.

112.     In light of the documented evidence of the Ocwen-HLSS and Ocwen-Altisource related-party transactions from which Erbey not only failed to recuse himself, but also actively participated in – the SEC Consent Order concluded:   "[T]here were no written policies or procedures regarding recusal and the practice that existed was flawed, inconsistent, and ad hoc." Thus, the Company "failed to devise and maintain its disclosed internal controls sufficient to ensure that [Erbey] recused himself from all approvals involving potential conflicts of interest in Ocwen's related party transactions."

113.     Another related-party transaction that Erbey approved was disclosed by the New York Department of Financial Services ("NYDFS") in a letter that it sent to Ocwen on August 4, 2014.  In that letter, the NYDFS revealed that Ocwen had entered into a transaction with an agent of Altisource Solutions to procure force-placed insurance for Ocwen, and that Erbey had expressly approved the transaction.

114.     Specifically, in January 2014, Altisource Solutions provided a memo to Ocwen's Credit Committee recommending that Ocwen retain Southwest Business Corporation ("SWBC") as Ocwen's force-placed insurance agent.   Erbey approved the transaction as a member of Ocwen's Credit Committee.

115.     As part of the deal, SWBC was required to pay Altisource Solutions' subsidiary, Beltline, a portion of the commissions it received from insurers because Altisource Solutions had recommended SWBC to Ocwen.  These fees amounted to about $60 million per year being paid to Altisource Solutions for performing essentially no work.

116.     Ocwen also agreed to pay SWBC a monitoring fee for monitoring whether its borrowers' homeowners insurance coverage had lapsed.  Altisource Solutions provided SWBC

with access to Ocwen's loan files and, in return, SWBC was required to remit to Altisource Solutions 75% of the monitoring fee paid by Ocwen, even though Altisource Solutions' existing contracts with Ocwen already required it to provide businesses designated by Ocwen with access to Ocwen's loan files.  Moreover, Ocwen agreed to pay SWBC **_double_** what it paid its previous force-placed insurance agent for providing monitoring services.  Thus, under the deal, Ocwen was indirectly paying Altisource Solutions approximately $5 million per year to provide a service it was already contractually obligated to provide, all pursuant to a deal approved by Erbey.

117.    This again illustrates the conflict of interest that Erbey had as both Chairman of Ocwen and Chairman of the Related Companies, as Erbey favored the interest of Altisource Solutions at the expense of Ocwen.

118.    This Court has now held that – **_as a matter of law_** – Defendants' statements concerning Ocwen's adoption of a policy to avoid potential conflicts of interest, including Erbey recusing himself from the negotiation and approval of significant transactions with the Related Companies (the "Related Party Statements"), were materially false and misleading.

119.    In partially granting the plaintiffs' motion for summary judgment in the Class Action Proceeding, this Court found that "the Related Party Statements are clear; it is plain that Ocwen, through its 10-Ks and proxy statement, assured investors of policies, practices and procedures to avoid conflicts of interest with the Related Companies."  However, the Court held that such a "policy, if it existed, was not written."  Furthermore, Ocwen did not have "a specific policy, written or otherwise, that required Erbey's recusal from Related Party Transactions. . . . Therefore, Ocwen's and Erbey's statements were misrepresentations."

120.    The Court further found that it "is also clear from Erbey's statement at the [December 3, 2013] Investor Day Conference, as well as the 10-Ks and proxy statement, that Erbey and Ocwen told investors that Erbey recused himself from Related Party Transactions." However, this Court found as a matter of law that "Erbey did not recuse himself from several flow transactions with HLSS." Accordingly, "Ocwen's and Erbey's statements were misrepresentations."

**B.    Ocwen Failed to Comply with Regulatory Requirements**

121.    Despite its representations to the contrary, Ocwen failed to properly meet its compliance obligations under the 2011 NYDFS Agreement and the NMS.

122.    First, Ocwen failed to comply with numerous servicing standards imposed by those agreements. For example, Ocwen improperly backdated letters advising borrowers of their right to appeal. On October 21, 2014, the NYDFS notified Ocwen that it had "uncovered serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to borrowers, likely causing them significant harm."

123.    When Ocwen denied a loan modification request from a borrower, it sent the borrower a denial letter. The denial letter stated that the borrower had thirty days to appeal the denial of the modification request. Due to a problem with Ocwen's servicing platform, however, Ocwen dated the denial letters prior to the date that they were actually sent to the borrower. Thus, by the time the borrower received the letter, her thirty days to appeal often had already lapsed.

124.    Although one of its employees discovered this backdating issue in 2013 and reported the problem to Ocwen's Vice President of Compliance, Ocwen failed to investigate or disclose the problem. In April 2014, the same employee raised the issue again. However, Ocwen again failed to disclose the problem. In December 2014, Ocwen consented to the

appointment of an operations monitor by the NYDFS to finally address the problem, which, as Ocwen agreed in the 2014 NYDFS Consent Order, had been going on "for years."

125.    Furthermore, in the 2014 NYDFS Consent Order, Ocwen agreed that it had violated various other servicing standards, including by improperly foreclosing on soldiers currently serving on active duty.  Among other things, Ocwen:

- failed to confirm that it had the right to foreclose before initiating foreclosure proceedings;

- failed to ensure that its statements to the court in foreclosure proceedings were correct;

- pursued foreclosure even while modification applications were pending;

- failed to maintain records confirming that it is not pursuing foreclosure of service members on active duty; and

- failed to assign a designated customer care representative.

126.    The dire state of Ocwen's electronic servicing platform also caused Ocwen to fail to comply with its regulatory obligations.  According to the CFPB's complaint against Ocwen, Ocwen inputted incomplete and inaccurate borrower loan information into REALServicing.  And even when Ocwen inputted accurate information into REALServicing, REALServicing "generated inaccurate information about borrowers' loans due to system deficiencies."  This meant that Ocwen was not properly servicing mortgage loans in accordance with regulatory requirements.  As stated by the CFPB, REALServicing lacked "the necessary automation and functionality to handle basic servicing operations."

127.    According to the CFPB, the problem with REALServicing was particularly acute with respect to the ResCap loans that Ocwen acquired and then attempted to transfer to REALServicing beginning in 2013.  Ocwen boarded ResCap loans with inaccurate loan information, as well loans "that contained payment history data that [Ocwen] had reason to

believe was inaccurate or incomplete." Ocwen also failed to verify that prior servicing advances or fees for the ResCap loans were "valid and actually owed by borrowers." In boarding loans onto REALServicing in 2013, Ocwen was missing invoices or documents to support "$98 million in corporate advances charged to borrowers."

128.    REALServicing suffered from additional problems alleged in the CFPB complaint.   For example, there were more than 10,000 comment codes and flags in REALServicing, but Ocwen did not have a complete data dictionary for employees to use to determine the correct comment code or flag to apply to a particular loan in a particular situation.

129.    Furthermore, REALServicing "lacked the capacity to process the large number of loans that Ocwen . . . acquired and, in part as a result, [REALServicing] has not been functional for lengthy periods of time."

130.    Members of Ocwen's senior management were well aware of the problems with REALServicing, yet failed to disclose them to the market.   Indeed, according the CFPB complaint, in 2014 Ocwen's Head of Servicing emailed Defendant Faris to complain about REALServicing, describing it as:

> An ***absolute train wreck***.  I know there's no shot in hell, but if I could change systems tomorrow, I would.  I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling.  I'm not talking about differentiators here. I'm talking about getting the system to stay online, escrow analysis to work, letters to print, etc.  It's ridiculous.

131.    Ultimately, Ocwen's Head of Servicing's prayers were answered, when in late 2017 Ocwen began to transition from REALServicing to a different electronic servicing platform licensed by an independent third party.

132.    However, the damage had already been done.  During the time that Ocwen used REALServicing, the significant defects in that technology caused Ocwen to violate numerous regulatory requirements designed to ensure the accurate and proper servicing of mortgage loans.

133.    On the same day that the CFPB filed suit against Ocwen, thirty state mortgage banking and regulatory agencies issued cease-and-desist orders against Ocwen subsidiaries that, in general terms, prevent Ocwen from acquiring mortgage servicing rights and originating or acquiring new mortgage loans.

134.    The egregiousness of Ocwen's representations of its regulatory compliance is compounded by the fact that in 2013 Ocwen had no compliance management system in place.

135.    The CFPB requires a regulated entity, such as Ocwen, to "develop and maintain a sound compliance management system" in order to assure compliance with regulatory requirements.

136.    However, according to documents filed in the Class Action Proceeding and the Broadway Gate Proceeding, Ocwen did not have a compliance management system in place in 2013.

137.    After conducting months of discovery, the class action plaintiffs stated in their pretrial order that "Ocwen had not updated RealServicing's systems and processes to be compliant with NYDFS or NMS servicing requirements, and did not have a compliance management system in place to assure that RealServicing complied with these standards."

138.    In the Broadway Gate Proceeding, the plaintiffs asserted in a publicly filed pretrial stipulation – again after the conclusion of months of discovery – that "Ocwen's compliance management system was for all intents and purposes nonexistent, and its servicing system of record, REALServicing, was compromised and unreliable."

C.     **Ocwen Did Not Have Effective Disclosure Controls and Procedures**

139.     Contrary to its public representations, Ocwen's disclosure controls and procedures were nonexistent, let alone effective.

140.     Ocwen had no disclosure controls with respect to preventing potential conflicts of interest in related-party transactions.  As summarized in the SEC Consent Order:  "[T]here were no written policies or procedures governing when an officer or director with a conflict of interest was required to be recused from negotiating or approving a related party transaction."  Moreover, "Ocwen personnel never developed guidelines under which such recusal was appropriate. ***This caused a number of control deficiencies***."

141.     The SEC Consent Order identified two major deficiencies in Ocwen's disclosure controls with respect to related-party transactions.  "First, the responsibility for determining whether recusal was appropriate was left largely to [Erbey], the person with the conflict of interest."  That is, it was left to the conflicted individual to determine whether he or she should be recused from the negotiation or approval of the related party transaction. "While Ocwen's in-house counsel occasionally provided advice on whether [Erbey] could participate in a related party transaction, ***there was no meaningful oversight*** of [Erbey]'s determination."

142.     Second, Ocwen personnel lacked any understanding of when recusals were required.  According to the SEC Consent Order, with respect to Defendants' representation in the 2012 annual report that Erbey recused himself from all significant transactions between Ocwen and the related parties, "Ocwen personnel had conflicting understandings of what types of transactions could qualify as significant, and they never attempted to reconcile these conflicting understandings."   Thus, there was no guidance of whether a transaction was sufficiently "significant" to warrant Erbey's recusal.  Furthermore, Erbey told the SEC that "the need to approve transactions in the Virgin Islands for tax reasons may have been grounds for

participating in the approval" of related-party transaction, notwithstanding Ocwen's purported recusal policy.

143.    The letter backdating issue is also indicative of serious internal control failings at Ocwen.  According to the NYDFS October 21, 2014 letter to Ocwen, the backdating issue was flagged for senior management in November 2013.  However, Ocwen did not do anything "to investigate or remedy the problem" at that time, and did not alert "regulators, borrowers, or other interested parties."  The issue was then raised again internally at Ocwen in April 2014, and still the problem was not elevated via the proper channels so it could be properly disclosed. According to the NYDFS, the problem remained unresolved as of October 2014, even though it had existed for years and had been flagged internally months earlier.

144.    Ocwen's failure to timely verify the accuracy of loan data being boarded onto REALServicing constituted a further lack of effective internal controls.  Loans acquired by Ocwen from other servicers often were transferred from systems of record with different data fields from REALServicing.  To assure that these loans were being properly serviced once boarded onto REALServicing, Ocwen had to verify the accuracy of critical loan data fields. However, Ocwen often failed to conduct this verification process in a timely manner.  As a result, improperly boarded loans were serviced incorrectly by Ocwen for months without Ocwen discovering the errors and disclosing the material deficiencies in its servicing platform.

145.    For example, Ocwen began boarding the ResCap loans onto REALServicing in the third quarter of 2013.  However, according to the CFPB complaint, Ocwen did not begin verifying that these loans were being correctly serviced until September 2014.  Thus, when Faris made his October 31, 2013 representation of Ocwen's "strong compliance," Ocwen had boarded

340,000 ResCap loans onto REALServicing but had not verified that a single loan had been properly boarded.

146.     Finally, Ocwen's lack of a compliance management system further renders its certification of the effectiveness of disclosure controls and procedures materially misleading.  A compliance management system is required to ensure that a regulated entity, such as Ocwen, is complying with all applicable rules and regulations.  Without a compliance management system, Ocwen did not have controls in place to make sure that any regulatory issues were being properly addressed and that material information concerning those issues was being disclosed.

## V.     Two Partial Disclosures in February 2014 Cause the Price of Ocwen's Stock to Plummet, Resulting in Significant Damages Suffered by Plaintiffs

147.     In February 2014, two partial disclosures with respect to the above-described misrepresentations were released to the market, causing the price of Ocwen common stock to significantly decline and Plaintiffs to suffer significant losses on their purchases of Ocwen stock.

148.     On February 6, 2014, the NYDFS halted indefinitely Ocwen's planned purchased of $39 billion of mortgage loans from Wells Fargo.  Ocwen's announcement of the indefinite hold on this transaction partially revealed to the market Ocwen's regulatory compliance issues.

149.     In a June 21, 2017 opinion issued in the Class Action Proceeding, the Court explained why:

> This corrective disclosure revealed to the market that [the NYDFS], an agency charged with policing regulatory compliance of mortgage servicers, had concerns about Ocwen's growth.  This announcement logically leads to the following inference:  [the NYDFS], the regulatory agency, had concerns related to regulatory compliance, which caused it to halt Ocwen's transaction.  This announcement revealed to the market that, despite multiple assurances of regulatory compliance, Ocwen had regulatory compliance issues.

150.     Thus, the February 6, 2014 announcement was partially corrective of Ocwen and Faris's material misstatement of Ocwen's "strong compliance" on October 31, 2013.  This partial disclosure was also partially corrective of Ocwen's statements concerning the effectiveness of its disclosure controls and procedures because it revealed that Ocwen had material regulatory noncompliance issues that had not been disclosed to the market.

151.     Upon the release of this information, the price of Ocwen common stock dropped over 4%, from a close on February 5, 2014 of $ 43.20 per share to a close of $ 41.38 per share on February 6, 2014.

152.     On February 26, 2014, the NYDFS sent a letter to Ocwen stating that it had "uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated."  The letter identified those companies as HLSS, Altisource Solutions, Altisource Residential and Altisource Asset Management.  The NYDFS continued:  "Indeed, the facts our review has uncovered to date cast serious doubts on recent public statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies."

153.     As the Court found in its opinion issued in the Broadway Gate Proceeding on November 7, 2017, this partial disclosure was partially corrective of Ocwen's recusal statements because it concerned the same subject matter as those statements.  This partial disclosure was also partially corrective of the disclosure controls and procedures statements – as the Court found in the Broadway Gate Proceeding on November 7, 2017 – because it revealed that Ocwen did not have effective disclosure controls and procedures to assure that Ocwen would disclose its lack of a recusal policy and Erbey's failure to recuse himself from related-party transactions.

154.    Upon the release of this letter, the price of Ocwen common stock dropped almost 7%, from a close on February 25, 2014 of $39.52 per share to a close of $36.76 per share on February 26, 2014.

155.    Although the full truth about the falsity of Ocwen's misstatements was not revealed until the end of the 2014, including numerous disclosures between August and December 2014, the partial disclosures set forth above caused Ocwen's stock price to decline significantly.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

**I.**    **Misrepresentations Concerning Ocwen's Recusal Policy and Erbey's Recusal from Transactions with the Related Companies**

156.    Ocwen's annual report for 2012, filed with the SEC on Form 10-K on or about March 1, 2013, misrepresented to investors that:  "We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related parties such as Altisource [Solutions], including Mr. Erbey's recusal from negotiations . . . and board approvals of such transactions."  The 2012 annual report was signed by Defendants Erbey and Faris.

157.    Ocwen's annual proxy statement for 2013, filed with the SEC on Schedule 14A on April 3, 2013, misrepresented to investors that:  "Due to the nature of Mr. Erbey's obligations to each of [Ocwen, HLSS, Altisource Solutions, Altisource Residential and Altisource Asset Management], he recuses himself from decisions pertaining to any related transactions."  The proxy statement was signed by Defendant Erbey.

158.    In a December 3, 2013 conference call, Defendant Erbey misrepresented to investors that:  "I'd like to stress, first of all, that [the Related Companies] are not affiliates, that they are independent companies.  They have independent boards, and they have management

teams. . . .   [W]e have [a] robust related party transaction approval process.  Any related party transaction between the [Related Companies and Ocwen], I actually recuse myself from . . . ."

159.    The statements set forth above in paragraphs 156 through 158 were materially false and misleading because Ocwen had not adopted policies to prevent potential conflicts of interest, and Erbey did not recuse himself from the approval of related-party transactions.

160.    Specifically, as agreed to by Ocwen in the 2014 NYDFS Consent Order, "Ocwen d[id] not have a written policy that explicitly require[d] potentially conflicted employees, officers, or directors to recuse themselves from involvement from transactions with [the Related Companies]."

161.    Moreover, as agreed to by Ocwen in the 2014 NYDFS Consent Order, Erbey did not recuse himself "from approvals of several transactions" with the Related Companies.

162.    This conclusion is confirmed by the SEC Consent Order, which found that "there were no written policies or procedures regarding recusal [at Ocwen] and the practice that existed was flawed, inconsistent, and ad hoc."  Thus, Ocwen "failed to devise and maintain its disclosed internal controls sufficient to ensure that [Erbey] recused himself from all approvals involving potential conflicts of interest in Ocwen's related party transactions."

163.    Furthermore, according to the HLSS Consent Order, Erbey "approved many transactions between HLSS and Ocwen in both his HLSS- and Ocwen-related capacities."  Erbey personally approved at least six transactions entered into between HLSS and Ocwen in 2012 and 2013.  Furthermore, in 2014, Erbey approved a purchase of $672 million of loans by HLSS from Ocwen "on the condition that it did not trigger losses for HLSS."

164.    Additionally, according to an August 4, 2014 open letter from the NYDFS to Ocwen, in January 2014 Erbey approved Ocwen's retention of SWBC as Ocwen's force-placed

insurance agent, even though SWBC kicked back tens of millions of dollars of fees to Altisource Solutions in return for its appointment by Ocwen.

165.    Moreover, as disclosed in the SEC Consent Order, in December 2012 Erbey voted as a member of the Ocwen Board of Directors to approve a $75 million bridge loan from Altisource Solutions to Ocwen, reviewing and approving a presentation before that was circulated to the Altisource Board of Directors as the basis for their vote to approve the loan.

166.    Finally, in partially granting the plaintiffs' motion for summary judgment in the Class Action Proceeding, this Court held that – ***as a matter of law*** – Defendants' statements concerning Ocwen's adoption of a policy to avoid potential conflicts of interest, including Erbey recusing himself from the negotiation and approval of significant transactions with the Related Companies, were materially false and misleading.

## II.    Misrepresentations Concerning Ocwen's Regulatory Compliance

167.    On October 31, 2013, Ocwen, Faris and Erbey held an investor call to discuss the financial results for the third quarter of 2013.  During that call, Faris discussed the transfer of ResCap loans onto the REALServicing platform.  Faris informed investors that the integration costs of the ResCap platform had been higher than expected because Ocwen had been "careful to assure excellent customer service and ***strong compliance*** throughout the transfer process."  Faris thus represented to the market that not only was Ocwen complying with its regulatory obligations, but also that Ocwen's compliance was "strong."

168.    This statement was materially false and misleading.  As Ocwen subsequently agreed to in the 2014 NYDFS Consent Order, Ocwen – in violation of the servicing standards of the 2011 NYDFS Agreement and the NMS – (a) "fail[ed] to confirm that it had the right to foreclose before initiating foreclosure proceedings"; (b) "fail[ed] to ensure that its statements to the court in foreclosure proceedings were correct"; (c) "pursu[ed] foreclosure even while

modification applications were pending"; (d) "fail[ed] to maintain records confirming that it is not pursuing foreclosure of servicemembers on active duty"; and (e) "fail[ed] to assign a designated customer care representative."

169.    Ocwen also improperly backdated letters to borrowers, in violation of numerous servicing standards under the 2011 NYDFS Agreement and the NMS.  Ocwen agreed in the 2014 NYDFS Consent Order that the improper backdating had been going on "for years" prior to December 2014.

170.    The dire state of Ocwen's electronic servicing platform also caused Ocwen to fail to comply with its regulatory obligations.  Ocwen inputted incomplete and inaccurate borrower loan information into REALServicing.  And even when Ocwen inputted accurate information into REALServicing, REALServicing "generated inaccurate information about borrowers' loans due to system deficiencies."  Furthermore, there were more than 10,000 comment codes and flags in REALServicing, but Ocwen did not have a complete data dictionary for employees to use to determine the correct comment code or flag to apply to a particular loan in a particular situation.  Also, REALServicing "lacked the capacity to process the large number of loans that Ocwen . . . acquired and, in part as a result, [REALServicing] has not been functional for lengthy periods of time."  These problems with REALServicing meant that Ocwen was not properly servicing mortgage loans in accordance with regulatory requirements.

171.    According to the CFPB, the problem with REALServicing was particularly acute with respect to the ResCap loans that Ocwen acquired and then attempted to transfer to REALServicing beginning in 2013.  Ocwen boarded ResCap loans with inaccurate loan information, as well loans "that contained payment history data that [Ocwen] had reason to believe was inaccurate or incomplete."  Ocwen also failed to verify that prior servicing advances

or fees for the ResCap loans were "valid and actually owed by borrowers."  In boarding loans

onto REALServicing in 2013, Ocwen was missing invoices or documents to support "$98

million in corporate advances charged to borrowers."

172.    Finally, Ocwen did not have a compliance management system in 2013.  Thus,

Ocwen had no system in place to assure its compliance with servicing requirements imposed by

regulators.

### III.    Misrepresentations Concerning the Effectiveness of Ocwen's Disclosure Controls and Procedures

173.    Ocwen reported that it had effective disclosure procedures and controls to ensure

that material information was publicly disclosed.

174.    In its annual report for 2012, Ocwen stated that:

> Our management, under the supervision of and with the
> participation of our Chief Executive Officer and Chief Financial
> Officer, has evaluated the effectiveness of our disclosure controls
> and procedures, as such term is defined in Rules 13a-15(e) and
> 15d-15(e) under the Securities Exchange Act of 1934, as amended
> (the Exchange Act), as of the end of the period covered by this
> Annual Report. Based on such evaluation, our Chief Executive
> Officer and Chief Financial Officer have concluded that, as of the
> end of such period, our disclosure controls and procedures are
> effective.

175.    In its quarterly report for the first quarter of 2013, filed with the SEC on Form

10-Q on or about May 8, 2013, Ocwen stated that:

> Our management, under the supervision of and with the
> participation of our Chief Executive Officer and Chief Financial
> Officer, evaluated the effectiveness of our disclosure controls and
> procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the
> Securities Exchange Act) as of March 31, 2013. Based on this
> evaluation, our Chief Executive Officer and Chief Financial
> Officer concluded that, as of March 31, 2013, our disclosure
> controls and procedures (1) were designed and functioning
> effectively to ensure that material information relating to Ocwen,
> including its consolidated subsidiaries, is made known to our Chief
> Executive Officer and Chief Financial Officer by others within

those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

176.     In its quarterly report for the second quarter of 2013, filed with the SEC on Form

10-Q on or about August 6, 2013, Ocwen stated that:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of June 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

177.     In its quarterly report for the third quarter of 2013, filed with the SEC on Form

10-Q on or about November 5, 2013, Ocwen stated that:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of September 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2013, our disclosure

controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

178.    Faris signed a certification in connection with Ocwen's 2012 10-K in which he stated that the CFO and he had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [Ocwen], including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared" and that the CFO and he had "[e]valuated the effectiveness of [Ocwen's] disclosure controls and procedures and presented in [the accompanying report] our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

179.    Faris provided identical certifications with Ocwen's quarterly reports for the first, second and third quarters of 2013.

180.    The statements set forth above in paragraphs 174 through 179 were materially false and misleading for a number of reasons.

181.    Ocwen had no disclosure controls with respect to preventing potential conflicts of interest in related-party transactions.  As summarized in the SEC Consent Order:  "[T]here were no written policies or procedures governing when an officer or director with a conflict of interest

was required to be recused from negotiating or approving a related party transaction." Moreover, "Ocwen personnel never developed guidelines under which such recusal was appropriate. This caused a number of control deficiencies."

182. The SEC Consent Order identified two major deficiencies in Ocwen's disclosure controls with respect to related-party transactions. "First, the responsibility for determining whether recusal was appropriate was left largely to [Erbey], the person with the conflict of interest." That is, it was left to the conflicted individual to determine whether he should be recused from the negotiation or approval of the related-party transaction. "While Ocwen's in-house counsel occasionally provided advice on whether [Erbey] could participate in a related party transaction, there was no meaningful oversight of [Erbey]'s determination."

183. Second, Ocwen personnel lacked any understanding of when recusals were required. According to the SEC Consent Order – with respect to Defendants' representation in the 2012 annual report that Erbey recused himself from all significant transactions between Ocwen and the related parties – "Ocwen personnel had conflicting understandings of what types of transactions could qualify as significant, and they never attempted to reconcile these conflicting understandings." Thus, there was no guidance as to whether a transaction was sufficiently "significant" to warrant Erbey's recusal. Furthermore, Erbey told the SEC that "the need to approve transactions in the Virgin Islands for tax reasons may have been grounds for participating in the approval" of related-party transactions, notwithstanding Ocwen's purported recusal policy.

184. The letter backdating issue is also indicative of serious internal control failings at Ocwen. According to the NYDFS October 21, 2014 letter to Ocwen, the backdating issue was flagged for senior management in November 2013. However, Ocwen did not do anything "to

investigate or remedy the problem" at that time, and did not alert "regulators, borrowers, or other interested parties."  The issue was then raised again internally at Ocwen in April 2014, and still the problem was not elevated to the proper channels so it could be properly disclosed. According to the NYDFS, the problem remained unresolved as of October 2014, even though it had existed for years and had been flagged internally months earlier.

185.    Ocwen's failure to timely verify the accuracy of loan data being boarded onto REALServicing constituted a further lack of effective internal controls.  Improperly boarded loans were serviced incorrectly by Ocwen for months without Ocwen discovering the errors and disclosing the material deficiencies in its servicing platform.

186.    Finally, Ocwen did not have a compliance management system.  Without a compliance management system, Ocwen did not have controls in place to make sure that any regulatory issues were being properly addressed and that material information concerning those issues was being disclosed.

## SUMMARY OF DEFENDANTS' SCIENTER

187.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

188.    Defendants Erbey and Faris acted with scienter with respect to the materially false and misleading statements discussed above.

189.    Defendant Erbey knew that he did not recuse himself from approving transactions between Ocwen and the Related Companies.  Indeed, as the Court has already found in the Class Action Proceeding, "Erbey would have knowledge of his approval of related party transactions if he personally approved them."  Erbey also knew that Ocwen had not adopted a policy requiring his recusal from related-party transactions.

-43-

190.    Defendant Faris, as a member of the Executive Committee that approved such transactions, also knew that Erbey did not recuse himself from the approval of transactions between Ocwen and the Related Companies.    Faris, as a member of Ocwen's Compliance Committee, knew that Ocwen had not adopted policies, procedures and practices to avoid potential conflicts in transactions between Ocwen and the Related Companies.

191.    As senior executives of Ocwen, Erbey's and Faris's knowledge of Erbey's involvement in the related party transactions is imputable to Defendant Ocwen.

192.    Defendant Faris knew that Ocwen was not in compliance with regulatory standards because he sat on Ocwen's Compliance Committee, which was responsible for ensuring Ocwen's compliance with all applicable laws and regulations.    As an executive of Ocwen, Faris's knowledge is imputable to Defendant Ocwen.

193.    Faris was also aware of the significant problems with REALServicing.  Indeed, according to the CFPB complaint, Ocwen's Head of Servicing wrote in an email to Faris that REALservicing was an "***absolute train wreck***" and that if he "could change systems tomorrow, [he] would."

194.    Faris certified that he conducted an evaluation of the effectiveness of Ocwen's disclosure controls and procedures.  He therefore knew that Ocwen lacked effective disclosure controls and procedures.

195.    As a senior executive of Ocwen, Faris's knowledge is imputable to Defendant Ocwen.

## SUMMARY OF DEFENDANTS' NEGLIGENCE

196.    Erbey and Faris were at least negligent in making the misstatements set forth above.

197.    Had Erbey acted with the standard of care required of a Chairman of a public company, he would have been aware that he was improperly not recusing himself from the approval of transactions between Ocwen and the Related Companies, that Ocwen did not have strong compliance with regulatory requirements, and that Ocwen did not have effective disclosure controls and procedures

198.    Had Faris acted with the standard of care required of a CEO of a public company, he would have been aware that Erbey was improperly not recusing himself from the approval of transactions between Ocwen and the Related Companies, that Ocwen did not have strong compliance with regulatory requirements, and that Ocwen did not have effective disclosure controls and procedures.

## PLAINTIFFS' ACTUAL RELIANCE

199.    Plaintiffs, through Brahman, actually, read (or heard), reviewed, and relied upon Defendants' misrepresentations prior to purchasing Ocwen stock.

200.    Brahman began purchasing Ocwen common stock for Plaintiffs in May 2013.

201.    Prior to purchasing Ocwen stock for Plaintiffs, one or more employees of Brahman actually read, reviewed and relied upon Ocwen's public disclosures, investor presentations and financial statements, including the 2012 annual report, the quarterly report for the first quarter of 2013, and the 2013 annual proxy statement.

202.    As Plaintiffs continued to purchase Ocwen stock throughout 2013 and early 2014, Brahman kept abreast of publicly-disclosed developments concerning Ocwen, and prior to purchasing stock, as applicable, actually read (or heard), reviewed, and relied upon Ocwen's quarterly reports for the second and third quarters of 2013, investor presentations, the October 31, 2013 conference call, and the December 3, 2013 conference call.

203.   When purchasing Ocwen stock on behalf of Plaintiffs, Brahman actually read (or heard) and relied on each of the statements described above.

204.   Had Brahman known the truth, it would not have purchased Ocwen common stock on behalf of Plaintiffs or, if it had done so, would not have paid the price it did.

**PRESUMPTION OF RELIANCE**

205.   In addition to Plaintiffs' actual reliance, Plaintiffs intend in the alternative to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:  (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Ocwen common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Ocwen common stock; and (e) Plaintiffs purchased Ocwen common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

206.   The market for Ocwen common stock was open, well-developed and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements and failures to disclose, Ocwen common stock traded at artificially inflated prices during the relevant period.

207.   At all relevant times, the market for Ocwen common stock was efficient for the following reasons, among others:  (a) Ocwen filed periodic reports with the SEC; (b) the stock was listed and actively traded on the NYSE; (c) numerous analysts, including analysts from BofA Merrill Lynch, Citigroup and Barclays, followed Ocwen; and (d) Ocwen regularly communicated with public investors via established market communication mechanisms,

including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

208.   Plaintiffs purchased Ocwen common stock in reliance on the market price of Ocwen common stock, which reflected all the information in the market, including the misstatements by Defendants.

## LOSS CAUSATION

209.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.   During the time that Plaintiffs purchased Ocwen common stock, as set forth in Exhibits A through H, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.   As a series of partial but inadequate disclosures was issued, as detailed above in paragraphs 147 through 154, the price of those securities dropped, and Plaintiffs were damaged.

210.   Defendants sought to assure investors that Ocwen had adopted policies to avoid potential conflicts of interest in related-party transactions, including Erbey recusing himself from the negotiation and approval of transactions with the Related Companies. In doing so, Defendants concealed the foreseeable risk that Ocwen's lack of policies and Erbey's involvement in related-party transactions would lead to increased scrutiny from, and potential penalties imposed by, its regulators.   That risk partially materialized when the NYDFS issued its February 26, 2014 letter to Ocwen stating that it had "uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated," thus causing the price of Ocwen stock to decline as detailed above.

211.   Defendants Ocwen and Faris also sought to assure investors that Ocwen was in "strong compliance" with its regulatory obligations.  In doing so, they concealed the foreseeable risk that Ocwen's regulatory noncompliance would lead to increased scrutiny from, and potential penalties imposed by, its regulators.  That risk partially materialized when, on February 6, 2014, the NYDFS halted indefinitely Ocwen's planned purchased of $39 billion of mortgage loans from Wells Fargo, causing the price of Ocwen stock to decline as detailed above.

212.   Finally, Defendants sought to assure investors that Ocwen had effective disclosure controls and procedures.  In doing so, they concealed the foreseeable risk that Ocwen's lack of disclosure controls and procedures would lead to increased scrutiny from, and potential penalties imposed by, its regulators.  That risk partially materialized when, on February 6, 2014, the NYDFS halted indefinitely Ocwen's planned purchased of $39 billion of mortgage loans from Wells Fargo, and when, on February 26, 2014, the NYDFS publicly disclosed that it had "uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated," both of which caused the price of Ocwen stock to decline as detailed above.

## NO SAFE HARBOR

213.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ocwen who knew that those statements were false when made.

## **FIRST CAUSE OF ACTION**

### **Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
### **Against All Defendants**

214.    Plaintiffs repeat and reallege paragraphs 23-195 and 199-213 as if set forth herein.

215.    This Cause of Action is asserted against Defendants Ocwen, Erbey, and Faris for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

216.    Defendants Ocwen, Erbey, and Faris, both directly and indirectly, used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Ocwen common stock; and (iii) cause Plaintiffs to purchase Ocwen common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Ocwen, Erbey, and Faris took the actions set forth above.

217.    Defendants Ocwen, Erbey, and Faris both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the

purchasers of Ocwen common stock in an effort to artificially inflate and maintain the market prices for Ocwen common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

218.   By virtue of their high-level positions at the Company, Erbey and Faris were authorized to make public statements, and made public statements on Ocwen's behalf.  These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

219.   In addition, Ocwen, Erbey, and Faris had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of the Company's securities would be based on truthful, complete and accurate information.

220.   Defendants Ocwen, Erbey, and Faris acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them. Defendants Ocwen's, Erbey's, and Faris's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Ocwen's operations, business, performance and prospects from the investing public, Erbey's recusal from the negotiation and approval of transactions with the Related Companies, Ocwen's compliance with regulatory requirements, and the effectiveness of Ocwen's disclosure controls and procedures.  By concealing these material facts from investors, Ocwen, Erbey and Faris supported the artificially inflated price of Ocwen's securities.

221.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Ocwen's securities.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Ocwen, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Ocwen, Erbey, and Faris, but not disclosed in public statements by Ocwen, Erbey, and Faris, Plaintiffs purchased Ocwen common stock at artificially inflated prices.  As a series of partial but inadequate disclosures were issued, the price of Ocwen's securities substantially declined.

222.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Ocwen, which was concealed by Ocwen, Erbey, and Faris, Plaintiffs would not have purchased Ocwen common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

223.    By virtue of the foregoing, Defendants Ocwen, Erbey, and Faris have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

224.    As a direct and proximate result of Defendants Ocwen's, Erbey's, and Faris's, wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's securities.

225.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants Ocwen, Erbey, and Faris in the matter *In re Ocwen Financial Corporation Securities Litigation*, 14-cv-81057-WPD (S.D. Fla.), as well as a tolling

agreement between Plaintiffs and Defendants, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## SECOND CAUSE OF ACTION

### Violations of Section 18 of the Exchange Act
### Against All Defendants

226.    Plaintiffs repeat and reallege paragraphs 23-73, 79-91, 93-156, 159-166, 173-186, 196-204, and 209-213  as if set forth herein.

227.    As alleged herein, Defendants Ocwen, Erbey and Faris negligently caused statements to be made in the Company's 2012 annual report (filed with the SEC pursuant to the rules or regulations of the Exchange Act), and Defendants Ocwen and Faris negligently caused statements to be made in the Company's quarterly reports for the first, second and third quarters of 2013 (filed with the SEC pursuant to the rules or regulations of the Exchange Act), which statements were, at the time and in light of the circumstances under which made, false or misleading with respect to material facts.

228.    In purchasing Ocwen stock, Plaintiffs' investment team actually read, and had direct eyeball reliance on, the statements in the 2012 annual report, and on the statements in the first, second and third quarter reports of 2013.

229.    Specifically, one or more employees of Brahman actually read and relied upon the following statements:

> - "We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related parties such as Altisource [Solutions], including Mr. Erbey's recusal from negotiations regarding and credit committee and board approvals of such transactions."  - 2012 annual report.

- "Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), as of the end of the period covered by this Annual Report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective." – 2012 annual report.

- "Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of March 31, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure." – 2013 first quarter report.

- "Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of June 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by

Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure." – 2013 second quarter report.

- "Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of September 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure." – 2013 third quarter report.

- Ocwen's CEO and CFO had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to them by others within those entities, particularly during the period in which this report is being prepared" and had "[e]valuated the effectiveness of [Ocwen's] disclosure controls and procedures and presented in [the accompanying report] our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation." – Faris certifications to 2012 annual report, 2013 first quarter report, 2013 second quarter report, and 2013 third quarter report.

230. In ignorance of the falsity of Defendants' statements or of the true facts, Plaintiffs purchased Ocwen's securities in actual, eyeball reliance upon Defendants' representations.

231.    Defendants' materially false or misleading statements artificially inflated the price of Ocwen securities.

232.    Had they known the true facts, Plaintiffs would not have purchased the Ocwen securities and/or would not have purchased them at the inflated price they paid.

233.    Upon the partial disclosure of the true facts and/or the partial materialization of the concealed risks, the price of Ocwen common stock dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

234.    By reason of the foregoing, Defendants Ocwen, Erbey and Faris are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. §78*r*.

235.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants Ocwen, Erbey and Faris in the matter *In re Ocwen Financial Corporation Securities Litigation*, 14-cv-81057-WPD (S.D. Fla.), as well as a tolling agreement between Plaintiffs and Defendants, Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the accrual of this cause of action.

### THIRD CAUSE OF ACTION

**Violations of Section 20(a) of the Exchange Act**
**Against the Defendants Erbey and Faris**

236.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

237.    This Cause of Action is asserted against Defendants Erbey and Faris and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

238.    Each of Defendants Erbey and Faris was at the time of the wrongs alleged herein a controlling person of Ocwen within the meaning of Section 20(a) of the Exchange Act.

239.     By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge of the materially false and misleading statements filed with the SEC and disseminated to the investing public, Defendants Erbey and Faris had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

240.     Defendants Erbey and Faris were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, Defendants Erbey and Faris each had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

241.     By reason of the conduct alleged in the First Cause of Action, Ocwen is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Erbey and Faris are liable pursuant to Section 20(a) based on their control of Ocwen.

242.     By reason of the conduct alleged in the Second Cause of Action, Ocwen is liable for violations of Section 18 of the Exchange Act, and Defendants Erbey and Faris are liable pursuant to Section 20(a) based on their control of Ocwen.

243.     Defendants Erbey and Faris are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of Ocwen common stock.

244.   Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants Ocwen, Erbey and Faris in the matter *In re Ocwen Financial Corporation Securities Litigation*, 14-cv-81057-WPD (S.D. Fla.), as well as a tolling agreement between Plaintiffs and Defendants, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## FOURTH CAUSE OF ACTION

### Fraud
### Against All Defendants

245.   Plaintiffs repeat and reallege paragraphs 23-195, 199-204, and 208-212 as if set forth herein.

246.   Defendants Ocwen, Erbey, and Faris made, authorized or caused the representations and/or omissions set forth above.

247.   Those representations and omissions were material.

248.   The material representations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' representations omitted and concealed material statements of fact from Plaintiffs.

249.   Each such Defendant knew its representations were false and/or misleading, and their omissions were material and rendered their representations misleading, at the time they were made or omitted.

250.   Defendants knew that Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements would induce Plaintiffs to purchase Ocwen common stock at inflated prices.

251.   Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.  Plaintiffs would not have purchased Ocwen common stock at all, or at the prices they paid, had they known the true facts regarding, *inter alia*, Erbey's approval of transactions with the Related Companies, Ocwen's violation of regulatory requirements, and Ocwen's lack of effective disclosure controls and procedures.

252.   As a direct and proximate result of such reliance, and these Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

### **FIFTH CAUSE OF ACTION**

**Negligent Misrepresentation
Against All Defendants**

253.   Plaintiffs repeat and reallege paragraphs 23-186, 196-204, and 208-212 as if set forth herein.

254.   Defendants Ocwen, Erbey, and Faris authorized or caused the representations and/or omissions set forth above.

255.   These Defendants supplied false information for use by Plaintiffs in making an investment decision.

256.   Defendants Ocwen, Erbey, and Faris were aware that Plaintiffs were a large investor and actively sought to induce Plaintiffs to purchase Ocwen common stock.  Plaintiffs' purchases of large amounts of stock helped keep Ocwen's stock price high because of increased demand.  Defendants Erbey and Faris collectively held millions of shares and options to acquire Ocwen common stock at the time Plaintiffs purchased Ocwen common stock.  Thus, Defendants Erbey and Faris directly benefitted from Plaintiffs' purchases of Ocwen stock, and had a pecuniary interest in those transactions.  As a result of their pecuniary interest in the transactions,

Defendants Erbey and Faris had a duty to exercise reasonable care and competence in providing information about Ocwen to Plaintiffs.

257.    Defendants Erbey and Faris made misrepresentations that they knew, or should have known, to be false in order to induce Plaintiffs to purchase Ocwen common stock.

258.    Defendants Erbey and Faris breached their duty to exercise reasonable care in making these misrepresentations to Plaintiffs.

259.    Plaintiffs reasonably relied on the information Defendants Ocwen, Erbey and Faris provided and were damaged as a result of these misrepresentations.  Plaintiffs would not have purchased Ocwen common stock at all, or at the prices they paid, had they known the true facts regarding, *inter alia*, Erbey's approval of transactions with the Related Companies, Ocwen's violation of regulatory requirements, and Ocwen's lack of effective disclosure controls and procedures.

260.    By reason of the foregoing, Defendants are liable to Plaintiffs for negligent misrepresentation.

261.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a) Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b) Awarding Plaintiffs punitive damages;

(c) Awarding Plaintiffs their attorneys' fees and costs; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: March 20, 2018                     Respectfully submitted,

                                                */s/ Robert F. Elgidely*

Robert F. Elgidely
Florida Bar No. 111856
relgidely@gjb-law.com

GENOVESE JOBLOVE & BATTISTA

200 East Broward Boulevard, Suite 1110
Fort Lauderdale, FL 33301
Tel.  954.453.8022

and

*Of Counsel*

LOWENSTEIN SANDLER LLP

Lawrence M. Rolnick, NY Bar No. 2024784
lrolnick@lowenstein.com
Marc B. Kramer, NY Bar No. 2167146
mkramer@lowenstein.com
Michael J. Hampson, NY Bar No. 4699120
mhampson@lowenstein.com
1251 Avenue of the Americas
New York, NY  10020
Tel. 212.262.6700

Thomas E. Redburn, Jr., NJ Bar No. 033661995
tredburn@lowenstein.com
One Lowenstein Drive
Roseland, NJ 07068
Tel. 973.597.2500

            *Attorneys for Plaintiffs*