UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-cv-80359-DMM

BRAHMAN PARTNERS II, L.P.;
BRAHMAN PARTNERS III, L.P.;
BRAHMAN PARTNERS II OFFSHORE,
LTD.; BRAHMAN INSTITUTIONAL
PARTNERS, L.P.; BRAHMAN C.P.F.
PARTNERS, L.P.; BRAHMAN
PARTNERS, L.P.; BRAHMAN
PARTNERS IV, L.P.; BRAHMAN
PARTNERS IV (CAYMAN) LTD.; and BH
INVESTMENTS FUND, L.L.C.,

      Plaintiffs,

v.

OCWEN FINANCIAL CORPORATION,
WILLIAM ERBEY, and RONALD FARIS,

      Defendants.

_____/

### <u>ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS</u>

THIS CAUSE comes before the Court upon Defendants Ocwen Financial Corporation ("Ocwen"), William Erbey ("Erbey"), and Ronald Faris's ("Faris") Motion to Dismiss, filed May 22, 2018. (DE 35). All of the Plaintiffs submitted a response in opposition to Defendants' Motion to Dismiss on June 15, 2018. (DE 38). Defendants replied on June 26, 2018. (DE 39). Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B), this case has been stayed and all pretrial deadlines have been vacated pending resolution of this Motion to Dismiss. (DE 37). For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

## I.    BACKGROUND

Defendant Ocwen was founded by Defendant Erbey in 1988 and is one of the largest mortgage loan servicers in the United States.  (DE 1 ¶¶ 35, 43).  At all times relevant to this lawsuit, Defendant Erbey was the Executive Chairman of Ocwen and Defendant Faris was Ocwen's Chief Executive Officer.  (DE 35 at 3).

Since at least 2009, Ocwen has been spinning off certain of its business segments into four purportedly independent companies: Altisource Solutions S.A. ("Altisource Solutions"), Home Loan Servicing Solutions, Ltd., Altisource Residential Corporation ("Altisource Residential"), and Altisource Asset Management Corporation ("Altisource Asset") (collectively, the "Related Companies").  (DE 1 ¶¶ 47 –52).  As the Related Companies were created, Erbey received significant equity stakes in each of them and, while maintaining his position as Executive Chairman at Ocwen, became Chairman of all of them.  (*Id.* ¶ 47).  After each Related Company was spun off from Ocwen, Ocwen continued to do business with the Related Company.  By 2012, Ocwen licensed loan servicing technology from Altisource Solutions, hired as its exclusive insurance agency a subsidiary of Altisource Solutions, sold non-performing loans to Altisource Residential, and signed a fifteen-year asset management agreement with Altisource Asset.  (*Id.* ¶¶ 48–52).

Ocwen grew rapidly between 2010 and 2013, acquiring, for example, Goldman Sach's and Morgan Stanley's mortgage servicing businesses.  (*Id.* ¶ 58).  One such purchase was of 1.74 billion loans from Residential Capital, LLC (the "ResCap" loans).  (*Id.* ¶ 59).  Ocwen's rapid growth led to increased regulatory oversight.  In 2011, the New York State Department of Financial Services (the "NYDFS") required Ocwen to enter into an agreement governing Ocwen's mortgage servicing practices (the "2011 NYDFS Agreement").  (*Id.* ¶ 62).  In 2012, the

NYDFS discovered that Ocwen had violated the 2011 NYDFS Agreement and required Ocwen to retain a compliance monitor to review Ocwen's servicing practices for a two-year period. (*Id.* ¶ 63). Moreover, the ResCap loans purchased by Ocwen were subject to the National Mortgage Settlement ("NMS") with the Consumer Finance Protection Bureau ("CFPB"), which meant that Ocwen had to adhere to the servicing standards set forth in the NMS. (*Id.* ¶¶ 64–65).

Plaintiffs Brahman Partners II, L.P., Braham Partners III, L.P., Braham Partners II Offshore, Ltd., Braham Institutional Partners, L.P., Braham C.P.F. Partners, L.P., Braham Partners IV, L.P., Braham Partners IV (Cayman), Ltd., and BH Investment Fund, L.L.C. (collectively, "Braham Partners") are investment funds managed by a common advisor. (*Id.* ¶ 3). Plaintiffs purchased significant amounts of Ocwen stock in 2013. (*Id.* ¶ 5). Plaintiffs allege that their purchases of Ocwen stock were made in reliance on material misstatements or omissions made by Defendants regarding Erbey's involvement in the Related Companies, Ocwen's disclosure controls and procedures, and Ocwen's compliance with its regulatory obligations. Plaintiffs' Complaint pleads fives causes of action against Defendants: (1) violations by all Defendants of Section 10(b) of the Securities Exchange Act and Rule 10b-5, (2) violations by all Defendants of Section 18 of the Securities Exchange Act, (3) violations of Section 20(a) of the Securities Exchange Act by Defendants Erbey and Faris, (4) common law fraud by all Defendants, and (5) negligent misrepresentation by all Defendants.

## II.    LEGAL STANDARD

### A.  Pleading standards

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and must take the factual allegations stated therein as

true. *Erickson v. Pardus*, 551 U.S. 89, 93 (1997); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

When assessing the sufficiency of a complaint's factual allegations, a court need not demand perfect clarity. According to Rule 8(a), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations omitted); Fed. R. Civ. P. 8(a). This standard does, however, require more than bare allegations or conclusions by the plaintiff. The factual assertions must be sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp.*, 550 U.S. at 555 (citation omitted). "Dismissal is appropriate where it is clear the plaintiff can prove no set of facts in support of the claims in the complaint." *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas. Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

In addition to the pleading standards under Rule 8(a), fraud claims must also meet the special pleading requirements under Rule 9(b), which states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A complaint alleging fraud must therefore set forth "(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Rule 9(b)'s heightened pleading requirements apply to any cause of action for fraud, so Plaintiffs must meet the Rule 9(b)

4

standard for all of their causes of action.  Failure to satisfy the Rule 9(b) pleading standards is a ground for dismissal.  *Id.*

Private securities fraud claims must additionally meet the heightened pleading standard of the PSLRA.  15 U.S.C. § 78u-4(b).  The PSLRA mandates that in any private action brought under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Securities Exchange Act"), in which the plaintiff alleges that the defendant made a material misstatement or omission of fact, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Id.* § 78u-4(b)(1).  Additionally, "in any private action arising under [the Securities Exchange Act] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2)(A).  The PLSRA also dictates that private actions brought under the Securities Exchange Act must allege loss causation, "that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  *Id.* § 78u-4(b)(4).

**B.  Substantive claims**

The Complaint pleads fives causes of action against Defendants: (1) violations by all Defendants of Section 10(b) of the Securities Exchange Act and Rule 10b-5, (2) violations by all Defendants of Section 18 of the Securities Exchange Act, (3) violations of Section 20(a) of the Securities Exchange Act by Defendants Erbey and Faris, (4) common law fraud by all Defendants, and (5) negligent misrepresentation by all Defendants.

Section 10(b) of the Securities Exchange Act forbids the use of any manipulative or deceptive device in connection with the purchase or sale of any security in contravention of rules and regulations prescribed by the U.S. Securities and Exchange Commission ("SEC").   15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  "To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission;  (2) made with scienter;  (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or mission; (5) economic loss [i.e. damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *FindWhat*, 658 F.3d at 1295 (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236 (11th Cir. 2008)) (alterations in original).

Section 20 of the Securities Exchange Act is not a freestanding claim, but is a way of imposing liability "not only on the person who actually commits a securities law violation, but also on an entity or individual that controls the violator."  *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010).  To state a claim against Defendants Erbey and Faris under Section 20, Plaintiffs must allege that Defendants Erbey and Faris had both (1) the power to control the general affairs of the entity liable for the primary Section 10(b) or Rule 10b-5 violations when that violation occurred and (2) the power to control or influence the specific policy that resulted in the primary violation under Section 10(b) or Rule 10b-5.  *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, 2016 WL 9413421 (S.D. Fla. June 29, 2016).

Section 18 of the Securities Exchange Act imposes liability for misleading statements made "in any application, report, or document filed pursuant to [the Securities Exchange Act] or

any rule or regulation thereunder." 15 U.S.C. § 78r(a). "Under section 18, a plaintiff must only plead and prove that the defendant made or caused to be made a material misstatement or omission in a document filed with the Securities Exchange Commission and that the plaintiff relied on the misstatement or omission." *Magna Inv. Corp. v. John Does One through Two Hundred*, 931 F.2d 38, 39 (11th Cir. 1991) (per curiam).

To state a claim for common law fraud in Florida, a plaintiff must allege that (1) the defendant made a false statement or omission of material fact (2) while knowing the statement was false, (3) the statement was made for the purpose of inducing the plaintiff to rely on it, (4) plaintiff's reliance was reasonable, and (5) the plaintiff suffered damages. *Arnold*, 839 F. Supp.2d at 1289 (citing *Mergens v. Dreyfoos*, 166 F.3d 1114 (11th Cir. 1999)). To state a claim for negligent misrepresentation, plaintiff must state that "1) the defendant made a misrepresentation of material fact; 2) the defendant either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; 3) the defendant intended to induce another to act on the misrepresentation; and 4) an injury resulted to the plaintiff who acted in justifiable reliance upon the misrepresentation." *Id.* (citing *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 127 F.3d 1390, 1393 (11th Cir. 1997)).

## III.   DISCUSSION

Plaintiffs set forth three sets of statements by Defendants that they allege are material misstatements or omissions intended to induce Plaintiffs to buy Ocwen stock. The first set of statements concerns Erbey's conflicts of interest (the "Erbey Statements"), the second concerns the controls and procedures that Ocwen had in place to ensure that the company adequately disclosed information about the company's health to its investors (the "Disclosure Controls &

Procedures Statements" or the "DC&P Statements"), and the third concerns Ocwen's regulatory compliance (the "Regulatory Compliance Statement").   In response to these allegations, Defendants argue that Plaintiffs' entire Complaint should be dismissed because Plaintiffs do not properly plead loss causation as to any of the misstatements.   Defendants also argue that the claims based on the Regulatory Compliance Statement should be dismissed because, first, the statement is mere puffery and thus not actionable, and second, Plaintiffs fail to adequately plead scienter.   Because loss causation is sufficient to resolve the Motion to Dismiss as to the Regulatory Compliance Statement, I need not take up Defendants' other arguments regarding that alleged misstatement.

### A.  State Law Causes of Action

Defendants argue that Plaintiffs' entire Complaint, including the state law causes of action for fraud and negligent misrepresentation, should be dismissed because Plaintiffs fail to plead loss causation.  (DE 35 at 1).  Loss causation, however, is not an element of fraud or negligent misrepresentation under Florida law.  *See Lopez v. Rica Foods, Inc.*, 277 Fed. Appx. 931, 932–33 (11th Cir. 2008) (holding that the lower court erred in forcing plaintiffs to plead loss causation for claims of fraudulent or negligent misrepresentation); *Johnson v. Davis*, 480 So.2d 625, 627 (Fla. 1985) (listing elements of fraud under Florida law).  "To adequately plead causation in a fraud claim under Florida law, a plaintiff must only allege damage or injury as a result of the misrepresentation." *Lopez*, 277 Fed. Appx. at 932–33.  Damages need not be pleaded with particularity, so though the Complaint is not terribly specific regarding Plaintiffs' damages, it does sufficiently allege that Plaintiffs were damaged by Defendants' misrepresentations.  (DE 1 ¶ 252, 261).  Accordingly, Defendants' Motion to Dismiss is denied as to the state law claims, Counts IV-V, in the Complaint.

## B. Loss Causation

To show loss causation, "a plaintiff must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (quotations omitted). "The plaintiff must show that the defendant's fraud—as opposed to some other factor—proximately caused his claimed losses." *FindWhat*, 658 F.3d at 1309.

Plaintiffs here rely on a fraud-on-the-market theory of loss causation. A fraud-on-the-market theory of causation is based on the idea that, in an efficient market, information that is already known by the market will not cause a change in stock price because that information has already been incorporated by the market into the stock price. *Id.* at 1310. When new information is released, however, stock prices may be affected. A plaintiff can thus attempt to show that a material misrepresentation or omission caused their loss by showing that, when that misrepresentation or omission was clarified or revealed to the public, the stock price decreased and that decrease was more likely than not attributable to the clarification or revelation of the misrepresentation. *Id.* at 1310-1311. Specifically, a plaintiff can prove loss causation by: "(1) identifying a corrective disclosure (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for the price drop, so that the factfinder can infer that is it more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors— that caused at least a substantial amount of price drop."[1] *Id.* at 1311–12 (footnote and quotations omitted).

---

[1] In the alternative, Plaintiffs also attempt to prove loss causation through the materialization-of-risk theory. (DE 38 at 14–15). Under the materialization-of-risk theory, a plaintiff need not show that a

An alleged corrective disclosure must meet certain definitional requirements.  First, a corrective disclosure must relate to the same subject matter as the prior misstatement—"only then can the disclosure be said to have a '*corrective* effect,' rather than merely a '*negative* effect.'"  *Id.* at 1311 n.128 (quoting *In re Initial Public Offering Sec. Litig.*, 399 F. Supp.2d 261, 266 (S.D.N.Y. 2005)) (emphasis in original).  The corrective disclosure need not "precisely mirror" the earlier misstatement, but it must at least "relate back to the misrepresentation and not to some other negative information about the company."  *Meyer*, 710 F.3d at 1197 (quoting *In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)).  Second, a corrective disclosure must—by definition—reveal new information, and cannot merely confirm information that is already disclosed.  *FindWhat*, 658 F.3d at 1311 n.28.

Plaintiffs need not plead a single, complete corrective disclosure, but can instead show that earlier misstatements were corrected through a series of partial corrective disclosures. *Meyer*, 710 F.3d at 1197.  Additionally, the Eleventh Circuit has held that "the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure."  *Id.* at 1201.  Though the announcement of a regulatory investigation reveals the possibility of fraud

---

corrective disclosure revealed the truth of an earlier misstatement; instead, a plaintiff need only show that the defendant concealed information that would pose a risk to the stock's value and that the concealed risk materialized, thereby causing the price inflation induced by the concealment of that risk to fall. *Hubbard v. BankAtlantic Bancorp., Inc.*, 688 F.3d 713, 726 (11th Cir. 2012).  The Eleventh Circuit, however, has twice declined to decide whether the materialization-of-risk theory is an acceptable means of proving loss causation in this Circuit.  *See id.*; *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 Fed. Appx. 855, 861 n.7 (11th Cir. 2015) (per curiam).  In *Hubbard*, the Eleventh Circuit assumed—without deciding whether the theory can be used in this Circuit—that the materialization-of-risk theory was valid in order to explain why, even under that theory, the plaintiff failed to prove loss causation. *Hubbard*, 688 F.3d at 726 n.25.  In *Sapssov*, after finding that the plaintiff failed to allege loss causation under a "corrective disclosure" theory, the Eleventh Circuit still declined to even analyze the plaintiff's allegations under the materialization-of-risk theory.  *Sapssov*, 608 Fed. Appx. at 861 n.7.  The Eleventh Circuit wrote, by way of explanation, that "loss causation is sufficient to resolve this case."  *Id.*
Because the materialization-of-risk theory is not recognized by any controlling precedent in this Circuit, I decline to recognize it here.  There is, however, current and clear precedent on the definitional requirements of a corrective disclosure for purposes of the fraud-on-the-market theory of loss causation. That precedent is sufficient to resolve this case.

and its accompanying sanctions, and may therefore be immediately followed by a decrease in stock price, investigations do not, "in and of themselves, reveal to the market that a company's previous statements were false or fraudulent." *Id.*

Defendants argue that the alleged corrective disclosures do not share the same subject matter as the prior misstatements and do not reveal new information to the market. I will discuss each set of alleged misstatements and corrective disclosures in turn.

### 1. The Erbey Statements

The first set of alleged misstatements identified by Plaintiffs concern Erbey's position at and financial stake in Ocwen and the Related Companies. Plaintiffs allege that Ocwen represented to investors that they had "policies, procedures, and practices" in place "to avoid potential conflicts involving significant transactions" with the Related Companies. (DE 1 ¶ 156). Moreover, Ocwen reported that "[d]ue to the nature of Mr. Erbey's obligations to each of [Ocwen and the Related Companies], he recuses himself from decisions pertaining to any related transaction." (*Id.* ¶ 157). Erbey himself repeated such sentiments to investors on a December 3, 2013 conference call, saying, "I'd like to stress, first of all, that [the Related Companies] are not affiliates, that they are independent companies. They have independent boards, and they have management teams. . . [W]e have [a] robust related party transaction approval process. Any related transaction between the [Related Companies and Ocwen], I actually recuse myself from." (*Id.* ¶ 158). According to Plaintiffs, these statements are untrue because Ocwen did not have a written recusal policy and because Erbey did not recuse himself from transactions between Ocwen and the Related Companies. (*Id.* ¶¶ 160–161).

Plaintiffs allege that these statements were partially corrected by a letter sent to Ocwen's general counsel on February 26, 2014 by the NYDFS (the "February 26 Letter"). (*Id.* ¶ 153).

The February 26 Letter announced the NYDFS's concerns about potential conflicts of interest between Ocwen and the Related Companies and requested documentation from Ocwen about the relationship between Ocwen and the Related Companies.   (DE 35-10).   Specifically, the February 26 Letter revealed that the NYDFS had discovered that Erbey was Executive Chairman of Ocwen and Chair of each of the Related Companies and that Erbey was the largest shareholder of Ocwen and each of the Related Companies.   (*Id.*)  The February 26 Letter further revealed that Ocwen's Chief Risk Officer himself had a conflict of interest with one of the Related Companies, and, perhaps most concerningly, "seemed not to appreciate the potential conflicts of interest posed by [his] dual role," telling the NYDFS monitor that "Ocwen paid his entire salary, but he did not know and had apparently never asked which company paid his risk management staff."   (*Id.*)   The NYDFS requested "detailed information" about the financial interests of Ocwen officers in the Related Companies, the financial interests in Ocwen of officers of the Related Companies, and "[a]ll policies, procedures, and practices employed by Ocwen and the affiliated companies to avoid or mitigate potential conflicts of interest."  (*Id.* at 2).

Defendants argue that the February 26 Letter is not a corrective disclosure because it does not reveal new information.  (DE 35 at 12).   According to Defendants, "Plaintiffs' Complaint is bereft of any allegations that Ocwen failed to disclose previously that members of its management owned shares in the Related Companies and that Mr. Erbey was chair of all the Related Companies."  (*Id.*)

I do not agree with Defendants' analysis.  While Erbey's position at and financial interest in Ocwen and the Related Companies may have been public knowledge, the February 26 Letter revealed that Ocwen did not have appropriate rules and procedures in place to prevent potential conflicts of interest, or, if Ocwen did have those rules and procedures, Erbey did not abide by

them.  It is one thing to know that the company in which you have invested employs officers with potential conflicts of interest—of which the company is well aware and takes precautions to prevent—and another to find out that the precautions that you thought were in place were illusory.[2]  The February 26 Letter is at least a partial corrective disclosure as to the Erbey Statements, and Defendants' Motion to Dismiss is denied as to those statements.

## 2.  The DC&P Statements

The second set of alleged misstatements identified by Plaintiffs concerns Ocwen's disclosure controls and procedures ("DC&P").  In numerous annual and quarterly reports, Ocwen reported that it had in place effective DC&P to ensure that any information that the company was required to disclose pursuant to the Securities Exchange Act was actually discovered and disclosed by the company.  (DE 1 ¶¶ 173–177).  According to Plaintiffs, though, those reports were materially false and misleading.  (*Id.* ¶ 180).  To prove that statements about the efficacy of

---

[2] In *Meyer*, which Defendants do not cite in either their Motion to Dismiss or their reply in support of such Motion, the Eleventh Circuit held that the announcement of an investigation by a regulatory authority, without more, is insufficient to constitute a corrective disclosure.  710 F.3d at 1201.  The court reasoned that, though the announcement of an investigation may cause the stock price to fall, "that is because the investigation can be seen to portend an added *risk* of future corrective action.  That does not mean that investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent."  *Id.* (emphasis in original).  Still, the court noted that its holding was "not to say that an [] investigation could never form the basis for a corrective disclosure.  We merely hold that the disclosure of an [] investigation, standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything."  *Id.* at 1201 n.13 (quotations omitted).

Though Defendants failed to raise this argument in their Motion, I note that, here, *Meyer* is not controlling.  First, the February 26 Letter revealed not just the fact of the NYDFS's concerns, but also the *subject* of those concerns.  The February 26 Letter detailed the specific conflicts of interest between Ocwen and the Related Companies that concerned the NYDFS, and provided sufficient detail to reveal—at least partially—the falsity of Ocwen and Erbey's recusal statements.

Second, Plaintiffs allege much more than just the NYDFS investigation.  Plaintiffs allege that Ocwen entered into a consent order with the NYDFS in 2014, in which Ocwen agreed that it did not have a written recusal policy and that Erbey did not recuse himself from approving transactions between Ocwen and the Related Companies.  (DE 1 ¶¶ 159–161).  Plaintiffs further allege similar findings in a 2016 SEC order instituting a settled administrative proceeding against Ocwen and in a 2015 order instituting a settled administrative proceeding against one of the Related Companies.  (*Id.* ¶¶ 162–165).  These facts are therefore distinguishable from *Meyer,* in which all that Plaintiffs alleged was the regulatory investigation itself.

the company's DC&P must have been false or misleading, Plaintiffs point to a variety of information that Ocwen allegedly should have, but did not, disclose: for example, Ocwen did not have rules necessary to prevent Erbey's conflicts of interest from affecting transactions between Ocwen and the Related Parties, Ocwen did not properly verify the accuracy of loan data boarded onto its mortgage servicing technology, and Ocwen did not have a compliance management system. (DE 1 ¶¶ 181, 185–186).

Plaintiffs point again to the February 26 Letter as a partial corrective disclosure for the DC&P Statements. (*Id.* ¶¶ 152–153). Plaintiffs argue that the February 26 Letter disclosed to the market that the NYDFS, a regulatory agency, had concerns about Erbey's potential conflicts of interest, and as such, the February 26 Letter "revealed that Ocwen did not have effective disclosure controls and procedures to assure that Ocwen would disclose its lack of a recusal policy and Erbey's failure to recuse himself from related-party transactions." (*Id.* ¶ 153).

Plaintiffs identify a second partial corrective disclosure for the DC&P Statements: an announcement made by Ocwen on February 6, 2014 (the "February 6 Announcement"). (*Id.* ¶¶ 148–151) In the February 6 Announcement, Ocwen disclosed that, at the request of the NYDFS, Ocwen had put an indefinite hold on a previously announced purchase of the servicing rights to 184,000 loans from Wells Fargo. (DE 35-18). The February 6 Announcement did not specify why the NYDFS requested that Ocwen halt the Wells Fargo transaction. (*Id.*) The February 6 Announcement simply stated that "Ocwen will continue to work closely with the NY DFS [sic] to resolve its concerns about Ocwen's servicing portfolio growth." (*Id.*)

Plaintiffs essentially make the same argument for both of these alleged corrective disclosures: though the corrective disclosures did not directly discuss Ocwen's DC&P, the corrective disclosures reveal that other statements made by Ocwen—about Erbey's conflicts of

interest and Ocwen's regulatory compliance—were false.  If Ocwen's DC&P had operated as effectively as Ocwen claimed they did, Ocwen would not have been able to make the other false statements.   Therefore, in revealing the falsity of those other statements, the corrective disclosures also revealed the falsity of Ocwen's statements about the efficacy of their DC&P.

I think that Plaintiffs' logic is too circuitous.  "In order to qualify as corrective, the disclosure must share the same subject matter as the prior misstatement." *FindWhat*, 658 F.3d at 1311 n.28.  Ultimately, the corrective disclosures alleged by Plaintiffs implicate Ocwen's DC&P (or the lack thereof), but they do not deal directly with the subject of the DC&P.  Accordingly, Defendants' Motion to Dismiss is granted as to the DC&P Statements.[3]

### 3.   The Regulatory Compliance Statement

The Regulatory Compliance Statement was made during an October 31, 2013 conference call held by Ocwen, Faris, and Erbey to discuss Ocwen's financial results for the third quarter of 2013 with Ocwen investors.  (DE 1 ¶ 167).  During the call, Faris discussed the transfer of the ResCap loans, which Ocwen had recently purchased and which were subject to the NMS, onto Ocwen's mortgage servicing platform, the REALServicing electronic servicing platform ("RealServicing").  (*Id.* ¶¶ 60, 64–65, 77–78).  RealServicing was owned by Altisource Solutions, one of the Related Companies.  (*Id.* ¶ 48).  During the conference call, Faris told investors that the costs of integrating the ResCap loans onto the RealServicing platform had been higher than expected because Ocwen had been "careful to assure excellent customer service and strong compliance throughout the transfer process." (*Id.* ¶ 78).

According to Plaintiffs, Faris's statement was materially misleading because Ocwen was not maintaining strong compliance with its regulatory obligations.  (*Id.* ¶¶ 168–172).   In

---

[3] Plaintiffs do not argue that loss causation as to the DC&P Statements can be proved by a materialization-of-risk theory, so even if that theory were a sufficient means of proving loss causation, it would not affect my determination here.  (DE 38 at 14–15).

particular, the RealServicing platform was rife with problems that caused Ocwen not to service mortgage loans in accordance with regulatory requirements. (*Id.* ¶¶ 170–172).   Among the problems listed by Plaintiffs, Ocwen input incomplete and inaccurate borrower loan information into RealServicing; RealServicing generated inaccurate information about borrowers' loans even when accurate information had been put into the RealServicing platform; and RealServicing did not have the capacity to process the large number of loans that Ocwen had acquired and, as a result, was not functional "for lengthy periods of time." (*Id.* ¶ 170)

Plaintiffs allege that the Regulatory Compliance Statement was partially corrected by the February 6 Announcement that the NYDFS had halted Ocwen's purchase of the Wells Fargo loans. (*Id.* ¶ 150).   According to Plaintiffs, the February 6 Announcement revealed that Ocwen did not have, as Faris stated, "strong compliance."   Though the February 6 Announcement did not directly reference Ocwen's regulatory compliance, Plaintiffs argue that the announcement of sanctions by a regulatory agency leads directly to the inference that Ocwen must not have been compliant with its regulatory requirements.

As with the DC&P Statements, though, I think the connection between the Regulatory Compliance Statement and the alleged corrective disclosure is too attenuated. The February 6 Announcement reveals only that the NYDFS was concerned with Ocwen's "servicing portfolio growth," but it does not specify the nature or subject of the NYDFS's concerns.   It does not mention Ocwen's regulatory compliance at all, let alone the specific instance of supposed compliance alluded to by Faris on the October 31 conference call.   Although Plaintiffs seem to construe Faris's statement as an assertion that Ocwen had strong compliance generally, it specifically concerned Ocwen's compliance with its regulatory obligations during the transfer of the ResCap loans onto the RealServicing platform.   Given the complete lack of detail or

explanation in the February 6 Announcement for why the NYDFS halted Ocwen's purchase of the Wells Fargo loans, it is difficult to see how the February 6 Announcement could have corrected Faris's specific statement about Ocwen's compliance during the ResCap loan transfer.

Moreover, the Eleventh Circuit held in *Meyer* that the commencement of an investigation by a regulatory body, "without more, is insufficient to constitute a corrective disclosure." *Meyer*, 710 F.3d at 1201. As the Eleventh Circuit explained, regulatory investigations may cause stock prices to fall "because the investigation can be seen to portend an added *risk* of future corrective action. That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent." *Id.* That is, the announcement of an investigation *alone* does not correct any previous misstatement to the investing public.

Here, the February 6 Announcement does nothing more than reveal the existence of an investigation by the NYDFS. The February 6 Announcement gives no detail or clue as to the subject of the NYDFS's concerns or the regulatory obligations that Ocwen failed to meet. The Eleventh Circuit has stated that "loss causation analysis in a fraud-on-the-market case focuses on the following question: even if the plaintiffs paid an inflated price for the stock as a result of the fraud . . . did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?" *FindWhat*, 658 F.3d at 1312. The February 6 Announcement did not reveal any relevant truth that could have caused the Plaintiffs' losses. The Motion to Dismiss is accordingly granted with regard to the Regulatory Compliance Statement.

It is hereby **ORDERED AND ADJUDGED** that:

(1) Defendants Motion to Dismiss (DE 35) is **GRANTED IN PART AND DENIED IN PART**, consistent with this Order.

(2) The prior Order Setting Trial Date (DE 25) and Pretrial Scheduling Order (DE 26) are **VACATED**.  An amended schedule will be entered by a separate Order.

(3) Defendants' Corrected Motion to Strike Notice of Supplemental Authority (DE 42) is **DENIED AS MOOT**.

(4) Defendants' Motion to Strike Notice of Supplemental Authority (DE 41) is **STRICKEN**.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this $\underline{5}$ day of ~~November~~, 2018.

December

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Cc:     Counsel of record